# THE STATE, Appellant, v. MISSOURI PACIFIC RAILWAY COMPANY.

### In Banc, June 6, 1908.

1. **JUDICIAL NOTICE: Interstate Railroad: Missouri Pacific.** It is the trend of the judicial mind to expand the judicial horizon, and as decided cases ripen into precedents the list of things of which courts take judicial notice is being sensibly added to by growth; and where the court knows as well that the lines of a railroad company extend entirely through the State and far beyond it into other States as it does that the Missouri river is a navigable stream and an interstate highway, it will take judicial notice that such railroad is an interstate carrier. Hence, the court will take judicial notice in passing on the validity of the Eight-Hour Telegrapher's Law, that the defendant Missouri Pacific Railway Company is engaged in interstate commerce, although it is neither alleged in the indictment nor proved that it is so engaged.

2. **INTERSTATE COMMERCE: Police Regulations: Limitations Upon a State: Hours of Labor of Telegraph Operators.** Congress is the sole constitutional repository of power to regulate commerce among the States, and it also, in the exercise of that power, has exercised the incidental police power of regulating the hours of labor of railroad employees, such as trainmen and telegraph and telephone operators engaged in interstate traffic. But if a State law, referable to the vast and purposely undefined police power, only incidentally and indirectly affects interstate commerce, such as the hours of labor of such employees, it is valid under the U. S. Constitution, unless Congress has already occupied the exact ground by a Federal law, in which case the State legislation must give way, at least where the two acts involve irreconcilable differences of detail of regulation or antagonistic theories.

3. ———: ———: ———: ———: **Unconstitutional Act: No Distinction Between Intra-State and Interstate Commerce.** A State law so drawn as not to distinguish between interstate and intrastate commerce, there being at the time a Federal law covering the same ground of regulation and the two being in conflict, cannot stand as legislation upon intrastate commerce alone.

4. ———: ———: ———: ———: ———: ———: **Telegrapher's Eight-Hour Law.** The Act of the General Assembly of 1907 (Laws 1907, p. 332), making it unlawful for any corporation "operating a line of railroad in whole or in part in the State of Missouri" to require or permit any telegraph operator to be on duty for more than eight hours in a day of twenty-four hours, does not discriminate between telegraph operators assisting in the operation of interstate commerce trains and traffic, and those similarly employed in the operation of local trains and traffic; it puts them all under the same regulation, and the provisions of the act being interdependent and not separable, it is not, therefore, a valid regulation of commerce within the State.

5. ———: ———: **Prior Federal Law: Enforcement Postponed.** Where Congress enacted a law fixing certain hours for a day's labor for telegraph operators engaged in interstate commerce, but declared that the act was not to take effect until one year after its passage, a State act enacted within that time which fixes eight hours as a day's labor for a telegraph operator engaged in either intrastate or interstate commerce is to be considered in the same light as if the Federal law had gone into effect at once upon its passage; and if the two are in conflict and an attempt to regulate the same conduct relating to interstate traffic, the State law must fail.

6. **FEDERAL LAW: Power of State Over.** The Supreme Court of Missouri cannot determine the validity of a Federal law.

Appeal from Johnson Circuit Court.—*Hon. N. M. Bradley*, Judge.

AFFIRMED.

*Herbert S. Hadley*, Attorney-General, and *John Kennish* and *F. G. Ferris*, Assistant Attorneys-General, for the State.

(1) Acts of the Legislature are to be presumed constitutional until the contrary is clearly shown; and it is only when they manifestly infringe on some provision of the Constitution that they can be declared void for that reason. In case of doubt, every possible presumption not directly and clearly inconsistent with the language and subject-matter is to be made in favor of the constitutionality of the act. State ex rel. v. Railroad, 48 Mo. 471; State ex rel. v. Yancey, 123 Mo. 391; State v. Cantwell, 179 Mo. 261; State ex rel. v. McIntosh, 205 Mo. 602; State ex rel. v. Aloe, 152 Mo. 477; Atchison v. Mathews, 174 U. S. 96. (2) The Act of April 12, 1907, rests upon a reason of public policy growing out of the condition of the railroad business as to the movement of trains. It is properly confined to that class of persons, namely, telegraph operators spacing trains by the block system, and train-dispatchers, who, in their work, are required to exercise a high degree of knowledge and skill upon which the public generally must rely. Within the sphere of its operation it affects alike all persons similarly situated. The classification involved in the law is founded upon a reasonable basis, and is not within the constitutional inhibition against class legislation. State v. Swagerty, 203 Mo. 517; State v. Cantwell, 179 Mo. 245; Lynch v. Murphy, 119 Mo. 163; State v. Hathaway, 115 Mo. 36; State v. Miller, 100 Mo. 439; State ex rel. v. Tolle, 71 Mo. 645; Humes v. Railroad, 82 Mo. 231; Christy v. Elliott, 216 Ill. 40; Barbier v. Connelly, 113 U. S. 32;

Railroad v. Beckwith, 129 U. S. 29; Grainger v. Douglas, 148 Fed. 513; Brady v. Mattern, 125 Iowa 158. (3) It does not appear on the face of the indictment that defendant is engaged in interstate business, with its lines running into other States, and, therefore, defendant's point, as made in the motion to quash, that the act in question is in conflict with the act of Congress, cannot be considered. Statements contained in the motion to quash do not prove themselves. State v. Gordon, 196 Mo. 185. Said act of Congress, by its own terms, was not in force and effect at the time the alleged offense was committed. The law of the State remains in force until displaced by an express enactment of Congress in the proper exercise of its power over commerce. Smith v. Alabama, 124 U. S. 465; Nashville v. Alabama, 128 U. S. 96; State v. Addington, 77 Mo. 116.

*M. L. Clardy* and *R. T. Railey & Son* for respondent.

(1) The Legislature of 1907 had no legal right to select the telegraph operator and train-dispatcher from the natural class, as provided for in the law of 1905, and say that these specially named and favored should not be permitted to work more than eight hours out of a day of twenty-four hours, including one meal hour, while those belonging to the same natural class according to the Act of 1905—which is still in force—could be required to labor sixteen hours out of a day of twenty-four. Or, in other words, the act of 1907 is clearly a discrimination against the conductor, engineer, fireman and brakeman—who belong to the same natural class with the operator and train-dispatcher—and is "class legislation run mad." It is clearly in conflict with section 53, article 4, and the other provisions of the Constitution of Missouri of 1875, and is likewise contrary to

common sense. Henderson v. Koenig, 168 Mo. 375, 192 Mo. 710; State ex inf. v. Washburn, 167 Mo. 689; State v. Hill, 147 Mo. 67; State v. Thomas, 138 Mo. 95; State v. Walsh, 136 Mo. 400; State v. Gritzner, 134 Mo. 529; State v. Granneman, 132 Mo. 331; State v. Julow, 129 Mo. 176; State v. Loomis, 115 Mo. 307; State ex rel. v. Herrmann, 175 Mo. 340; State ex rel. v. Tolle, 71 Mo. 659; Lochner v. State, 198 U. S. 45; In re Jacobs, 98 N. Y. 98; Low v. Rees, 59 N. W. 362; Wheeler v. Phil., 77 Pa. St. 338; State ex rel. v. Hammer, 42 N. J. L. 435; People v. Williams, 189 N. Y. 131; Cooley's Con. Lim. (6 Ed.), 431, 481-483; Nichols v. Walter, 33 N. W. 800; Johnson v. Railroad, 45 N. W. 156; State v. Somers Point, 52 N. J. L. 32. (2) Said Act of 1907 discloses on its face that it was only intended to apply to the operation of trains upon railroads in this State, which had adopted and were using the "block system." We are informed that there are several roads in the State which have never used or adopted said "block system." Said act discriminates against those roads which are operating under "block system," for the obvious reason that the telegraph operators and train dispatchers under the latter system cannot be permitted to work more than eight hours out of a day of twenty-four, while the same class of employees performing identically the same class of service in behalf of those roads not using the "block system" can, by virtue of the Act of 1905, be required to work sixteen hours out of a day of twenty-four. It is plain that the telegraph operator under either the old system or the "block system" does identically the same kind of work, and needs the same amount of rest, and, so far as the public is concerned, both should have the same amount of rest while performing their respective duties. This is discrimination and special or class legislation. (3) The courts will take judicial notice of the fact that the Missouri Pacific Railway extends across the State of Mis-

souri from east to west, and likewise extends into the States of Kansas, Nebraska and Colorado. The courts will likewise take notice of the fact that defendant is extensively engaged in interstate business, and hence subject to the laws of Congress. The Congressional act provides, among other things, that no operator or train dispatcher shall be required or permitted to remain on duty for a longer period than nine hours in any twenty-four hour period. The converse of the proposition must be equally true. If so, Congress has said, in legal effect, that defendant had the right to work the operator mentioned in the indictment nine hours in a day of twenty-four. Henderson v. Koenig, 168 Mo. 369; Ex parte Arnold, 128 Mo. 264; State ex rel. v. Seibert, 123 Mo. 434. The Federal law must govern. Hence the Act of 1907 must give way to the act of Congress.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* and *F. G. Ferris,* Assistant Attorneys-General, for the State in reply.

(1) Whether the Act of 1907 is a general law or special law, depends fundamentally upon a question of classification. The Constitution does not forbid a reasonable and proper classification of the objects of legislation. 1 Lewis's Sutherland, Stat. Const. (2 Ed.), sec. 203. (2) "Classification is a legislative question, subject to a judicial revision only so far as to see that it is founded on real distinctions in the subjects classified." "The test is, not wisdom, but good faith, in the classification." 1 Lewis's Sutherland, Stat. Const. (2 Ed.), sec. 203; Erb v. Morasch, 177 U. S. 584; Railroad v. May, 194 U. S. 267; State v. Whitaker, 160 Mo. 70; Ins. Co. v. Dobney, 189 U. S. 301; Heath & Milligan Co. v. Worst, 207 U. S. 354; Seabolt v. Commonwealth, 187 Pa. St. 323. (3) No definite or absolute rule can be laid down by which a reasonable and proper

classification can be determined in all cases. The question must be determined in each case as it arises, and for that case alone. 1 Lewis's Sutherland, Stat. Const. (2 Ed.), sec. 203; Railroad v. May, 194 U. S. 267; Bachtel v. Wilson, 204 U. S. 36; Heath & Milligan Co. v. Worst, 207 U. S. 254. (4) Generic subjects may be divided and subdivided into as many classes as require legislation peculiar to themselves. 1 Lewis's Sutherland, Stat. Const. (2 Ed.), secs. 195, 199, 200; Erb v. Morasch, 177 U. S. 584; Bachtel v. Wilson, 204 U. S. 36; Ex parte Berger, 193 Mo. 16; Woodson v. State, 69 Ark. 521; Durkin v. Kingston, 171 Pa. St. 193; State v. Bixman, 162 Mo. 1; State v. Whitaker, 160 Mo. 70; Muller v. Oregon, 28 Sup. Ct. Rep. 324; Ins. Co. v. Dobney, 189 U. S. 301; Heath & Milligan Co. v. Worst, 207 U. S. 354. (5) The exemption of operators at day stations where but one operator is employed is not arbitrary or unreasonable. In re Ten-Hour Law, 54 Atl. 602; State v. Whitaker, 160 Mo. 70; Bachtel v. Wilson, 204 U. S. 36; Ins. Co. v. Dobney, 189 U. S. 301; Woodson v. State, 69 Ark. 521; Heath & Milligan Co. v. Worst, 207 U. S. 354; Railroad v. May, 194 U. S. 267; Erb v. Morasch, 177 U. S. 584; Ex parte Berger, 193 Mo. 16; Hammon v. Coke Co., 156 Mo. 232; State v. Nelson, 52 Ohio St. 88. (6) And the exemption (in the case of certain day operators) of railroads not using the block system is not arbitrary or unreasonable. Cases cited under point 5. (7) Every legislative body may modify or abolish the acts passed by itself or its predecessors. The Act of 1907 displaces by repeal whatever in the Act of 1905 is inconsistent with it. 1 Lewis's Sutherland, Stat. Const. (2 Ed.), sec. 247; State v. Bixman, 162 Mo. 28; Ex parte Berger, 193 Mo. 16; Hammon v. Coke Co., 156 Mo. 232.

LAMM, J.—The State of Missouri appeals from a judgment *nisi* quashing an indictment against defendant for violating one of the labor laws of the State. To grasp the scope of indictment and laws (and criticisms leveled at both), it will be useful to make the following

### · STATEMENT OF THE CASE.

At the October term, 1907, of the Johnson County Circuit Court there was presented the following indictment (omitting caption):

"The grand jurors of the State of Missouri duly empaneled, sworn and charged diligently to inquire within and for the body of the county of Johnson in the State of Missouri, upon their oaths, present and charge:

"That at the said county of Johnson and State of Missouri on the 30th day of October, 1907, the Missouri Pacific Railway Company was and now is a corporation duly organized and doing business under the laws of the State of Missouri and engaged in operating a line of railroad in said State of Missouri; that then and there said Missouri Pacific Railway Company unlawfully did require and permit Herman McClain, a certain telegraph operator then and there in the employment of said Missouri Pacific Railway Company, to be on duty for more than eight hours in a day of twenty-four hours, said telegraph operator then and there being a telegraph operator who spaced trains by the use of the telegraph under what is known and termed the block system, to-wit, by reporting trains to another office or offices and to a train-dispatcher operating trains under signals, said telegraph operator then and there also being a train-dispatcher in the service of the said Missouri Pacific Railway Company whose duties substantially pertained then and there to the

movement of cars, engines and trains on the railroad of the said Missouri Pacific Railway Company by the use of the telegraph in dispatching and reporting trains and receiving and transmitting train orders, said telegraph operator then and there not being a telegraph operator at a station kept open only during the daytime where only one telegraph operator was employed, and said telegraph operator then and there not being on duty in any case of sickness, death, wreck or washout; against the peace and dignity of the State.

"EWING COCKRELL,
"Prosecuting Attorney within and for
Johnson County, Missouri."

On the 25th of November, 1907, defendant entered its appearance and filed a motion to quash, based on the general grounds that on its face the indictment failed to state facts showing defendant guilty of any offense known to the common law, the statutes of this State, or the State or Federal Constitutions. The fourth ground is that the indictment is based on an Act of the General Assembly (Laws 1907, p. 332) in conflict with the Constitution of the United States, the amendments thereto and the Constitution of Missouri in sundry specifications, earmarked from "a" to "o" inclusive, as follows:

"(a). Said act violates section 10 of article 2 of the Constitution of Missouri, 1875, in this, that courts of justice should be open to every person, and certain remedy provided for every injury to property, and that right and justice should be administered without sale, denial or delay.

"(b). Because said act violates section 21 of article 2 of said Constitution of Missouri, in this, that it authorizes the taking of defendant's property, for an alleged public use, by compelling it to pay telegraph operators for eight hours' service, when others belong-

ing to the same natural class, can be required to work double that length of time.

"(c). Because said act violates section 30 of article 2 of the Constitution of Missouri, 1875, in this, that no. person shall be deprived of his property, without due process of law. In other words, defendant's property cannot be confiscated under the guise of law, by fixing as a maximum, eight hours' labor, including one meal hour, for telegraph and telephone operators when, by so doing, they are thereby singled out of a natural class without any reference to the other members of said class.

"(d). Because said act violates section 28 of article 4 of said Constitution, in this, that no bill shall contain more than one subject, which shall be clearly expressed in its title; whereas, the act under consideration, in its title, simply refers to telegraph operators and train-dispatchers, while the body of the act undertakes to legislate in favor of telephone operators and other employees not mentioned in the title of the act.

"(e). Because said act violates section 28 of article 4 of said Constitution, in this, that no bill shall contain more than one subject, which shall be clearly expressed in its title; whereas the act under consideration, in its title, refers to all telegraph operators and train dispatchers in the State of Missouri, while the body of the act applies only to those working under the so-called 'Block-system.'

"(f). Because said Act of 1907 violates section 53 of article 4 of said Constitution, which reads as follows:

" 'The General Assembly shall not pass any local or special law . . . . regulating labor; . . . . granting to any individual any special privilege or immunity; . . . In all other cases where a general law can be made applicable, no local or special law shall be enacted; and whether a general law could have been

made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined, without regard to any legislative assertion on that subject.

"'Nor shall the General Assembly indirectly enact such special or local law by the partial repeal of a general law. . . . . '

"(g). Because said law of 1907 violates the foregoing section 53 of article 4 of said Constitution, in this, that it attempts to legislate in favor of telegraph, telephone, and other operators, as well as train-dispatchers, by singling them out from a natural class engaged in the operation of trains, and only requiring them to work not exceeding eight hours out of a day of twenty-four, including one hour for meals, while the engineer, fireman, conductor, and brakeman—who belong to the same natural class, are engaged in the operation of the same train, and whose welfare and immunity·from overwork is even more important to the protection of the traveling public from wrecks, collisions, and other dangers—as explicitly stated in the Act of 1905, page 112, may be required to work as much as sixteen hours out of a day of twenty-four, all this, too, notwithstanding said engineer, fireman, conductor and brakeman are required to carry out the orders transmitted to them by said operator or dispatcher: *A Fortiori,* they are required to do the physical work connected with the management and control of said train besides having all the responsibilities which devolve upon the operator or dispatcher; that said act ignores the fact that the operating crew of said train needs the same amount of rest which the operator or train-dispatcher may need, and by reason of the foregoing, is plainly class legislation, unjust discrimination in favor of two or more members of a natural class, and by reason thereof, violates all the foregoing provisions of the Constitution of Missouri.

"(h). Because said act violates section 53 of article 4 of said Constitution of Missouri, in this, that it discriminates in favor of those operators and dispatchers located at stations having both night and day service, as opposed to those operators and dispatchers located at stations having no night service, inasmuch as the latter may be worked half again as long as the former, notwithstanding the fact that the same responsibility devolves upon both alike.

"(i). Because said act violates section 53 of article 4 of the Constitution, supra, as well as the other provisions of same, in unjustly discriminating between services performed by telegraph operators and train dispatchers under the 'Block system,' as opposed to those engaged in the ordinary railroad service, operating under some other system.

"In other words, if a train-dispatcher or telegraph operator needs rest under the 'Block system,' the same would be equally true in regard to those who operate trains under the old system. Again, if it be necessary for the operator and dispatcher under the 'Block system,' to have a required amount of rest, in order to prevent wrecks and collisions in the operation of trains, then, for the security of the public, it is equally incumbent on operators and dispatchers not working under the 'Block system,' but performing the same class of service, to have an equal amount of rest.

"Said act, therefore, not only violates the foregoing provisions of our Constitution, in discriminating in favor of two or more members selected from a natural class, that is, in favor of telegraph operators and dispatchers over others equally concerned in running trains with safety to the public, but likewise violates said provisions by grossly discriminating in favor of those operating under the 'Block system,' as opposed to those performing a similar duty, equally important to the public safety, according to some other system.

"(j). Because said Act of 1907 is vague, indefinite, uncertain and unintelligible and as a result thereof, is in conflict with the various provisions of the Constitution, supra, as well as the general laws of this State. The last proviso of said Act of 1907 authorizes telegraph operators to be worked sixteen hours out of twenty-four hours, in case of sickness, death, wrecks, or washout, but as it does not mention whose sickness, death, etc., is involved, it leaves the court or jury, in construing the law, to apply it to either incumbent, or to any other officer of the road, from the president down.

"It being a highly penal statute, should be strictly construed, and neither court nor jury should be permitted, in a 'legislative way,' to supply what might have been intended, but not expressed.

"(k). Because said act is in conflict with article V of the Amendments to the Constitution of the United States, in this, that it deprives defendant of its property without due process of law as heretofore shown.

"(l). Because said act conflicts with article V of the Constitution of the United States, in this, that it authorizes the taking of private property for an alleged public use, without compensation, as heretofore shown.

"(m). Because said Act of 1907, supra, violates section 1 of article XIV of the Amendments to the Constitution of the United States, in this, that it denies to defendant the equal protection of the laws of the land.

"(n). Because said act is purely paternalistic in its nature, and the real purpose of said enactment of 1907 was to compel the railway companies of this State to increase the wages of telegraph operators; as the act itself can be accounted for in no other way.

"(o). Because said defendant is engaged in interstate business, with its lines running into Kansas, Col-

orado and elsewhere, and Congress, having already attempted to pass a general law on this subject, in conflict with said Act of 1907, which will take effect on the first day of January next, the Missouri Legislature, in passing the above law, acted without jurisdiction or power so to do.''

On a hearing, the motion to quash was sustained and (as said) the State appeals—the case being sent to Banc because of a Federal question.

At its session in 1905, the General Assembly enacted a highly penal statute (Laws 1905, p. 112), the object and general nature of which was to put train-dispatchers, telegraph operators, conductors, engineers, firemen, brakemen and other trainmen (not employees of sleeping car companies) in a class to themselves and to provide that none of that class of railroad employees be required to work more than sixteen hours within a day of twenty-four hours, subject to certain exceptions not material here.

In 1907 the General Assembly enacted another statute relating to telegraph operators and train-dispatchers, ignoring the Act of 1905 by making no reference to it and containing no general or special repealing clause. The Act of 1907 is as follows:

"LABOR: Telegraph Operators.

"*An Act relating to telegraph operators and train-dispatchers in the State of Missouri, and providing an eight hour day for such labor, with penalty for violation of said act.*

"Be it enacted by the General Assembly of the State of Missouri, as follows:

"Section 1. It shall be unlawful for any person, corporation or receiver operating a line of railroad in whole or in part in the State of Missouri, or any officer, agent or representative of such person, corporation or receiver, to require or permit any telegraph or telephone operator who spaces trains by the use of the

telegraph or telephone under what is known and termed the 'Block system' (defined as follows): Reporting trains to another office or offices or to a train-dispatcher operating one or more trains under signals, and telegraph or telephone levermen who manipulate interlocking machines in railroad yards or on main tracks out on the lines connecting side tracks or switches, or train-dispatchers in its service whose duties substantially, as hereinbefore set forth, pertain to the movement of cars, engines or trains on its railroad by the use of the telegraph or telephone in dispatching or reporting trains or receiving or transmitting train orders as interpreted in this section to be on duty for more than eight hours in a day of twenty-four hours, and it is hereby declared that eight hours shall constitute a day of employment for all laborers or employees engaged in the kind of labor aforesaid. Provided, that at stations that are kept open only during the day time where only one telegraph or telephone operator be employed, they may work twelve hours in a day of twenty-four hours, and that the hours of service of telegraph or telephone operators as interpreted in this section shall be consecutive, including one meal hour: Provided, further, that in case of sickness, death, wrecks or washout, telegraph or telephone operators may be held on duty not to exceed sixteen hours in a day of twenty-four hours.

"Sec. 2. Any person or persons, company or corporation, who shall violate any of the provisions of the preceding section, shall, on conviction, be fined not more than one thousand dollars.

"Approved April 12, 1907."

The Forty-Fourth General Assembly adjourned its regular session on the 16th day of March, 1907. Therefore the act last above went into effect June 14, 1907.

The Congress of the United States by its act ap-

proved March 4th, 1907 (U. S. Stat. at Large—59th Cong., Vol. 34, Pt. 1—Pub. Laws, p. 1415 et seq.), enacted as follows:

"Chap. 2939—*An Act to promote the safety of employees and travelers upon railroads by limiting the hours of service of employees thereon.*

"Be it enacted by the Senate and House of. Representatives of the United States of America in Congress assembled, that the provisions of this act shall apply to any common carrier or carriers, their officers, agents and employees, engaged in the transportation of passengers or property by railroad in the District of Columbia or any. Territory of the United States, or from one State or Territory of the United States or the District of Columbia to any other State or Territory of the United States or the District of Columbia, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States. The term 'railroad' as used in this act shall include all bridges and ferries used or ·operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease; and the term 'employees' as used in this act shall be held to mean persons actually engaged in or connected with the movement of any train.

"Sec. 2. That it shall be unlawful for any common carrier, its officers or agents, subject to this act to require or permit any °employee subject to this act to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employee of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty; and no such

employee who has been on duty sixteen hours in the aggregate in any twenty-four hour period shall be required or permitted to continue or again go on duty without having had at least eight consecutive hours off duty: Provided, that no operator, train-dispatcher, or other employee who by the use of the telegraph or telephone dispatches, reports, transmits, receives or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four hour period in all towers, offices, places, and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places, and stations operated only during the day time, except in case of emergency, when the employees named in this proviso may be permitted to be and remain on duty for four additional hours in a twenty-four hour period on not exceeding three days in any week: Provided, further, The Interstate Commerce Commission may after full hearing in a particular case and for good cause shown extend the period within which a common carrier shall comply with the provisions of this proviso as to such case.

"Sec. 3. That any such common carrier, or any officer or agent thereof, requiring or permitting any employee to go, be, or remain on duty in violation of the second section hereof, shall be liable to a penalty of not to exceed five hundred dollars for each and every violation, to be recovered in a suit or suits to be brought by the United States district attorney in the district court of the United States having jurisdiction of the locality where such violation shall have been committed; and it shall be the duty of such district attorney to bring such suits upon satisfactory information being lodged with him; but no such suit shall be brought after the expiration of one year from the date of such violation; and it shall also be the duty of the

Interstate Commerce Commission to lodge with the proper district attorneys information of any such violations as may come to its knowledge. In all prosecutions under this act the common carrier shall be deemed to have had knowledge of all acts of all of its officers and agents: Provided, that the provisions of this act shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employee at the time said employee left a terminal, and which could not have been foreseen: Provided, further, that the provisions of this act shall not apply to the crews of wrecking or relief trains.

"Sec. 4. It shall be the duty of the Interstate Commerce Commission to execute and enforce the provisions of this act, and all powers granted to the Interstate Commerce Commission are hereby extended to it in the execution of this act.

"Sec. 5. This act shall take effect and be in force one year after its passage.

"Approved, March 4, 1907, 11:50 a. m."

It will be seen (1) that the Federal statute was passed prior to the State statute of 1907, but went into effect a few months later; and (2) that the indictment is drawn under the Act of 1907, and not under the Act of 1905.

## OPINION.

Questions raised on this appeal cover the points enumerated in the motion to quash. They are discussed by counsel with zeal and learning. We shall consider them (so far as necessary) in reverse order— i. e., commencing with paragraph "o."

Does the Act of 1907 impinge upon the commercial power of Congress conferred by the Federal Constitution, as exercised by the Federal Act, *supra*?

(a)  A preliminary question challenges attention, viz.:  May we or may we not take judicial notice of the fact that the Missouri Pacific Railway Company is engaged in interstate as well as intrastate commerce? It is argued on behalf of the State that we may not (absent proof or allegation in the indictment, as here) assume defendant is so engaged.  But it seems to us we ought not to allow controlling force to that suggestion.  And this, because:

The trend of the judicial mind is to expand the judicial horizon and, as decided cases ripen into precedents, it is made manifest that the list of things of which courts take judicial notice is being sensibly added to by growth.  For instance, in Kansas City v. Scarritt, 169 Mo. l. c. 485, it is said:  "Almost every one knows that a burial ground does not enhance the value of the surrounding property, *and there is no reason why courts should pretend to be more ignorant than the rest of mankind.*"  As put in another case (Henry County v. Salmon, 201 Mo. l. c. 161):  "To this end we may assume a knowledge of events of current public history; for courts ought not to proceed on the theory that they do not know what everyone else does know." It was said in State ex rel. v. Cook, 171 Mo. l. c. 357-8: "It is a fact of common knowledge, of which the court may take cognizance, that in 1891 there were several foreign railroad companies which had theretofore approached our border with their roads and, under the express leave of the statute above quoted, had extended their lines into this State, some crossing it from one side to the other, some penetrating it to St. Louis, some to Kansas City, and some to other points."  If, now, as held in the Cook case, we may take judicial notice of things there enumerated, would we not be (to borrow an inspired metaphor—Matt. 23-24) "Blind guides, which strain at a gnat and swallow a camel," if we refused to take judicial notice of the patent and large

fact that defendant is now and always has been active-
ly engaged in interstate commerce? As pointed out by
defendant's learned counsel, we know as well that de-
fendant's railroad is a main-traveled highway, a throb-
bing artery of commerce stretching from St. Louis on
the eastern line of this State to Kansas City on the
western line and away into other States, as we know
that the Missouri river exists as a navigable stream
and takes the same course.

Let us look at it from another point of view, viz.:
That defendant has the charter power to do an inter-
state commerce business no one would question. That
defendant is organized for the very purpose of com-
mercial gain as a common carrier no one would ques-
tion. Given such power and such congenital and or-
ganized appetite for profit, would any court require
*proof* that defendant was using such power and ap-
peasing such appetite in ways ready to its hand? As
well (speaking in a homely way) require a solemn alle-
gation or proof that fishes swim, or that birds fly, as to
require allegation or proof that a going railroad cor-
poration is doing what it was born to do, to-wit, engage
in interstate commerce, when the alluring gains of
such traffic is spread like a feast before its eager cor-
porate eyes and nothing is nigh to hinder.

If more be needed to clinch the matter, we have
but to look to the general policy of our Constitution
and laws contemplating, and in some instances requir-
ing, that very thing to be done. For example, the Con-
stitution contemplates that all railroads operating in
this State should engage in interstate commerce. [Sec.
13, art. 12.] So, too, our statutes unmistakably point
to such traffic, as of course, by providing for railroad
connections (R. S. 1899, sec. 1035), by requiring an
interchange of business and allowing consolidations
(Sec. 1059), by giving power to aid a continuous line
(Sec. 1060), by granting power to own other lines and

stock in the corporations controlling them (Sec. 1061, Laws 1903, p. 127), by donating power to contract with each other (Sec. 1081), by requiring the acceptance of freight from each other at terminals and intermediate connecting points (Sec.1082, Sec. 1084), by the power to arrange joint tariffs (Sec. 1137). Keeping in mind, then, the public policy evidenced by such statutory provisions and others that might be cited, does not a vehement presumption arise that defendant company is subserving such governmental policy? Or may we toy with the situation by airily assuming that railroad companies never obey the law until their obedience is alleged and proved?

Finally, while it is true the indictment does not allege defendant is doing interstate business, yet no more does it allege it is doing an intrastate business. In this condition of things we are impliedly asked by counsel for the State, for purposes of the case, to take judicial notice of the fact that defendant is doing an intrastate business. If, now, we may assume the one, how comes it we may not, by the same token, assume the other? But we have pursued the matter far. There is no substantial merit in the State's contention and the point is ruled against it.

(b) Assuming, then, that defendant (as a common carrier of freight and passengers for hire) is not holding itself aloof from either but is engaged in both interstate and intrastate commerce, we are confronted by the Federal Act, *supra,* which serves notice on all the States of this Union that Congress, as the sole constitutional repository of power in regulating commerce among the States, has also exercised the incidental police power of regulating the hours of labor of railroad employees such as trainmen and telegraph and telephone operators engaged in that line of traffic. Defendant interposes said Federal Act as a defense. Learned counsel argue that because of the Federal Act

the State statute is rendered inoperative, in that, they say, it by its terms includes telegraph and telephone operators engaged in both intrastate and interstate commerce. Is there substance in this contention?

In getting at a right solution we may with profit remind ourselves of certain propositions to be assumed as put beyond all question or agitation.

In the first place, any State law that imposes a tax or other direct burden on interstate commerce, or directly interferes with the flow and freedom of traffic among the States, is unconstitutional and void. The Constitution of the United States empowers "Congress to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." In the exposition of that clause, Mr. Chief Justice MARSHALL (Brown v. Maryland, 12 Wheat. 445, *et seq.*) said: "The oppressed and degraded state of commerce previous to the adoption of the Constitution can scarcely be forgotten. It was regulated by foreign nations with a single view to their own interests; and our disunited efforts to counteract their restrictions were rendered impotent by want of combination. Congress, indeed, possessed the power of making treaties; but the inability of the Federal government to enforce them had become so apparent as to render that power in a great degree useless. Those who felt the injury arising from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the control over this important subject to a single government. It may be doubted whether any of the evils proceeding from the feebleness of the Federal government contributed more to that great revolution which introduced the present system than the deep and general conviction that commerce ought to be regulated by Congress. It is not, therefore, matter of surprise that the grant should be as extensive as the mischief, and

should comprehend all foreign commerce, and all commerce among the States. To construe the power so as to impair its efficacy would tend to defeat an object in the attainment of which the American public took, and justly took, that strong interest which arose from a full conviction of its necessity. What, then, is the just extent of a power to regulate commerce with foreign nations, and among the several States? This question was considered in the case of Gibbons v. Ogden, 9 Wheat. 1, in which it was declared to be complete in itself, and to acknowledge no limitations other than are prescribed by the Constitution. The power is co-extensive with the subject on which it acts, and cannot be stopped at the external boundary of the State, but must enter its interior."

Full and strict application of the foregoing doctrine has been uniformly made in a line of cases in the United States Supreme Court familiar to students in constitutional law.

In the next place, in the exercise of that vast and (purposely) undefined power, known as the police power—a power which lies at the root of, and gives vitality and validity to, any legislative enactment self-defensive of the general welfare of the people in their moral and physical health—it is settled doctrine that if a State law, referable to the exercise of the police power, only incidentally or indirectly affects interstate commerce, it is good under the provisions of the Federal Constitution heretofore quoted, unless Congress has occupied the exact ground by a Federal law, in which event State legislation must give way, at least where the two acts involve irreconcilable differences of detail of regulation or antagonistic theories. On this point Judge Cooley says (Cooley's Const. Lim. (7 Ed.), p. 856): "The line of distinction between that which constitutes an interference with commerce, and that which is a mere police regulation, is sometimes

exceedingly dim and shadowy, and it is not to be wondered at that learned jurists differ when endeavoring to classify the cases which arise.   It is not doubted that Congress has the power to go beyond the general regulations of commerce which it is accustomed to establish, and to descend to the most minute directions, if it shall be deemed advisable; *and that to whatever extent ground shall be covered by those directions, the exercise of State power is excluded.*   Congress may establish police regulations, as well as the States; confining their operation to the subject over which it is given control by the Constitution.''

The foregoing generalizations of our author were deduced from many cases—for example: Sherlock v. Alling, 93 U. S. 99; Railroad v. Husen, 95 U. S. 465; Smith v. Alabama, 124 U. S. 465; Railroad v. Alabama, 128 U. S. 96.   Referring to the same question, this court through SHERWOOD, J., in State v. Addington, 77 Mo. 1. c. 116, says: ''Such regulations by the State are valid in so far as concerns the constitutional provision we have quoted, *except when conflicting with regulations on the same subject prescribed by Congress.''*

As we understand the position of the learned Attorney-General and his learned assistants they do not seriously controvert the foregoing general propositions.   Their briefs in chief and in reply are mainly directed to the defense of the State law from assaults delivered against it on other points in the motion to quash.   As to the point in hand, as we see it, they content themselves with the insistence, *first,* that the act can stand as legislation on intrastate commerce alone and that, *second,* in any event, it was a valid law from June 14, 1907 (the date it went into effect), until March 4, 1908 (the date the Federal law went into effect) — during which time the violation charged occurred.   They do not argue that the two acts do not cover the same

ground in regulation, neither do they argue that they are not in conflict, as self-evidently they are, provided both refer to interstate commerce.

(1)   Assuming for the moment that fairly, *i. e.,* equitably, construed in their true spirit and intent, both laws were in effect at the same time, then the question is:   May the State law stand as legislation upon intrastate commerce alone?   We think not.   The exact question in another form was before the Supreme Court of the United States in two cases just decided (Howard v. Railroad, and Brooks v. Railroad, 207 U. S. 463).   In those cases that court was construing a Federal Fellow-servant Act, so drawn as not to distinguish between interstate commerce and intrastate commerce.   The cases proceed on the theory that the Federal Congress might enact a fellow-servant act which was solely applicable to interstate commerce but that an act so drawn as not to distinguish between the commercial power of Congress over interstate commerce and those strictly so engaged, and the power of the States to legislate upon intrastate commerce and those strictly engaged in that, could not stand.   It is not our purpose to discuss those cases or lengthen this opinion by quotations therefrom.   They illustrate the piercing and discriminating judgment with which that great court labors to preserve unimpaired the preclusive Federal power to regulate commerce among the States and at the same time preserve unimpaired the power of the several States of this Union to regulate affairs pertaining to their own internal business.

An analytical examination of the Act of 1907 shows that it does not discriminate between telegraph operators assisting in the operation of interstate commerce trains and traffic, and those similarly employed in local trains and traffic.   It puts them all under the same blanket regulation, and neither does the indictment discriminate between the two.   But one motive

underlies this law. The provisions of the act are inter-dependent and not separable—it must stand as a whole as written, or fall as a whole. It follows, we think, that on the doctrine of the Howard case and the Brooks case, *supra*, the State law can no more stand in this case than did the Federal law in those cases—provid-ed, of course, the Federal Act and State law (in just intendment) were in force at the same time, and to that novel question we now address ourselves.

(2) We must construe the Federal Act by reading into its dry letter its manifest spirit and purpose. Its dry letter reads that it shall not go into effect for one year. What was the meaning of, the object to be sub-served by, that suspension of the operation of the law? What, except to preserve the equities of the situation by impliedly giving common carriers engaged in inter-state commerce one year in which to get a supply of experienced telegraph and telephone operators and trainmen to carry on their business without interrup-tion and. hindrance, and otherwise adjust their busi-ness affairs to the shorter hours required by that act? When broadly judged, the Federal law must be con-strued as a notice (in the nature of a *caveat*) to all State Legislatures, *first,* that Congress has occupied the ground by its statutory regulations; *second,* that in its high wisdom it has prescribed and marked out a transition or preparatory period of one year (a sort of truce-period). Now with such broad and wise pur-pose read into the Federal Act shall any State Legisla-ture thereafter sit in judgment upon the wisdom of such truce-period and say, in effect: We deem it too long and too liberal? Shall it say, in effect: We see you have suspended your act for one whole year, we find by mathematical computation there is left six months or so which we may cover by a State law and accordingly we shall pass a law giving shorter hours than yours that will be good at least from June 14,

1907, until March 4, 1908? If the one law grants, by necessary implication, a breathing spell, shall the other take it away? If the one chalks out a policy, may the other rub it out?

In our opinion the comity that should exist between the State and Federal legislative power prohibits our taking that ungracious and narrow view. Whether the Federal act is constitutional or not, we may not decide—such prerogative is lodged elsewhere. With the wisdom of Federal exercise of police power in the matter in hand, we have nothing whatever to do —that is a matter for Congress. It is sufficient for us to know that uniformity in police regulations involving interstate commerce seems in the last few years, under the pressure of current events, to have called for Federal legislation—a sample of which is the Automatic Coupling Act lately under review in Johnson v. Railroad, 196 U. S. 1; Schlemmer v. Railroad, 205 U. S. 1.

It follows that the order quashing the indictment may be sustained on the ground herein discussed. Whether the motion to quash could be sustained also upon other grounds, is not necessary for us to decide in this case. Accordingly all other questions raised by that formidable motion are reserved. The judgment of the lower court is affirmed.

*Graves, J.,* concurs; *Gantt, C. J., Burgess* and *Fox, JJ.,* concur in result; *Woodson, J.,* is of opinion the act is unconstitutional on other grounds, but not for the reason given in the opinion, therefore he dissents; *Valliant, J.,* is absent.