JOSEPH E. LATTA and CLAUDIA D. LATTA, His Wife, Co-Partners Doing Business Under the Partnership and Trade Name of J. E. LATTA CONSTRUCTION COMPANY, (plaintiffs) appellants and respondents, v. ROBINSON ERECTION COMPANY, a Corporation, and A. ROBINSON, Sometimes Known as AL ROBINSON, (defendants) appellants and respondents, No. 42457—248 S. W. (2d) 569.

Court en Banc, April 17, 1952.

Rehearing Denied, May 12, 1952.

48

*James M. Douglas* and *Karol A. Korngold* for appellants; *Thompson, Mitchell, Thompson & Douglas* and *Frey & Korngold* of counsel.

*Daniel P. Reardon, John S. Marsalek* and *Moser, Marsalek, Carpenter, Cleary & Carter* for Robinson Construction Company, A. Robinson and Hon. Michael J. Scott.

50

██ DALTON, J.—Action to recover the amount of principal, interest and attorneys' fees alleged to be due on two described notes. The execution, delivery and non-payment of the notes was admitted and the cause was defended on the ground of want of consideration and fraud. Trial to a jury resulted in a verdict and judgment for plaintiffs for $65,187.31, being the amount of principal, interest and attorneys' fees claimed to be [570] due. Defendants moved for a new trial and the trial court ordered a remittitur of $28,000, within ten days, otherwise defendants' motion for a new trial would be sustained on the ground that the verdict was excessive. The remittitur was not made and no further order was entered.

██ Defendants subsequently obtained a special order of appeal, apparently on the theory that a final judgment had been entered against them on the verdict of the jury. Sec. 512.060 RSMo 1949. This action was no doubt due to the uncertainty as to whether the order for a remittitur constituted an order sustaining the motion for a new trial, or whether the motion for a new trial was in fact overruled by the lapse of ninety days in the the absence of a further order. Sec. 510.360 RSMo 1949. Plaintiffs also obtained a special order of appeal from the order granting a new trial. The matter of the order has now been settled by the opinion of this court in Steuernagel v. St. Louis Public Service Co., 361 Mo. 1066, 238 S. W. (2d) 426, 429. The remittitur not having been made within the time provided, the motion for a new trial stood sustained on the ground that the verdict was excessive. Defendants, therefore, had nothing to appeal from and their appeal is dismissed. We shall refer to the plaintiffs below as plaintiffs, or as appellants, and to defendants below, as defendants or as respondents.

The petition, in two counts to recover on the two notes, is in the usual form. Defendants by answer alleged that the notes were "given to plaintiffs by defendants wholly without consideration"; and that defendants "were induced to sign and did sign" the notes by fraud on the part of the plaintiffs in that plaintiffs falsely and fraudulently represented to defendants that the amount of said notes represented one-half (1/2) of the loss incurred in the completion of a certain contract entered into by plaintiffs and defendant Al Robinson as partners or joint adventurers; that "plaintiffs falsely and fraudulently represented to defendants that said sum was the amount due and owing after all proper setoffs and deductions"; that "plaintiffs knew that said sum so represented as being due and owing by defendants was not a true accounting between the partners"; and that "said representations were material and were relied upon by the defendants

and defendants were directly thereby induced to sign'' said notes to their detriment. The reply was a general denial.

Appellants assign error on the action of the trial court in sustaining defendants' motion for a new trial. It is contended that the court abused its discretion in granting a new trial on the ground of an excessive verdict, since the verdict was for the amount due under the terms of the notes; that no defense was shown; and that the court should have directed a verdict for plaintiffs. Respondents insist that ''the evidence presents a question for the jury with respect to fraud on the part of plaintiffs''; that reversible error appears in the instructions given to the jury on plaintiffs' behalf; that the granting of a new trial on the ground of an excessive verdict is equivalent to granting a new trial on the ground that the verdict is against the weight of the evidence; and that the granting of a new trial, under the facts shown by the record, was within the trial court's discretion. The material facts are not in dispute and we think the trial court should have directed a verdict for plaintiffs; and that it erred in granting defendants a new trial.

The notes in question were given in an alleged settlement of certain contractual relationships and liabilities between the parties. On or about February 10, 1948, plaintiffs entered into a contract with the United States Government for the building of a low water overflow dam in the Wood River Diversion Channel, in Madison County, Illinois. Subsequently, on February 27, 1948, plaintiffs and defendant Al Robinson entered into a written contract under which plaintiffs and said defendant agreed to carry out, as joint adventurers, the plaintiffs' said contract with the United States Government. Shortly thereafter, and by agreement between plaintiffs and Al Robinson, said defendant assigned his interest in the joint venture to the defendant Robinson Erection Company (now known as Robinson Construction [571] Company), upon the express agreement that Robinson individually would remain personally liable under his contract of February 27, 1948; and that the said Robinson Erection Company would assume the full liability of a joint adventurer and become liable to plaintiffs for all the liabilities and undertakings of Al Robinson under the said contract. The contract of February 27, 1948, among other things, provided that: (a) a separate bank account of the joint venture was to be established and maintained, funds were to be withdrawn only upon the joint signatures of the parties or their respective duly authorized representatives and each party agreed forthwith to put $5,000 in said account and, in the event additional funds were required, ''to deposit in the aforesaid checking account one-half of such additional funds as may be required in the performance of said contract''; (b) all monies received from the Government under plaintiffs' contract were to be deposited in the said bank account and all expenses were to be paid out of said

funds; (c) each party was to further furnish an equal amount of the funds necessary or requisite to the performance of the Government contract; (d) the parties were to share the profits and losses equally; (e) "miscellaneous services performed and material and equipment furnished or rented by either party * * * for the benefit of said joint undertaking," were to be billed monthly as against the joint undertaking, and were to be paid monthly out of the bank account maintained as aforesaid, and the rates charged for equipment so furnished or rented were to be "the then currently negotiated rates"; (f) if a loss was incurred, defendants were to pay plaintiffs, on demand, one-half of the loss; and (g) if disagreements could not be amicably adjusted between the parties, arbitration was provided for.

After the contract of February 27, 1948, was entered into, the plaintiffs and defendants put up the $5,000 each, as agreed, and as the work progressed the respective parties put up an additional $40,000 each. After a total advancement of $45,000, defendants refused to advance additional sums and plaintiffs advanced the necessary additional funds, completed the contract and paid all liabilities incurred. Defendants' last advancement of some $25,000 was apparently made in February 1949.

Plaintiffs were in the equipment rental, earth moving and concrete construction business. Joseph E. Latta was the active member of plaintiffs' co-partnership and he represented plaintiffs in connection with the joint venture in carrying out the contract for the construction of the Wood River Overflow Dam in question. Defendant Al Robinson had been in the construction business since 1939. He was the president and, for all practical purposes, he was the Robinson Erection Company. One J. A. Adams was defendants' representative in charge of the joint venture for the defendants. They were paying him and the job was "pretty much" up to him. Clayton W. McAuliff, an employee of the joint venture, was office manager and bookkeeper for the project. His office and records were "on the job site," and his duties included keeping all records and making reports with reference to the "financial picture." Latta and Robinson were called as witnesses for the defendants, while Adams and McAuliff testified for the plaintiffs.

Performance of the Government contract required that much equipment be obtained on a rental basis and such was the normal procedure. Most of this equipment was rented from the plaintiffs, but some was rented from defendants and other companies. Latta testified that, within a month after the contract was awarded, rates for every piece of construction equipment to be furnished by plaintiffs and used on the job were "negotiated" on the basis of the equipment rental rates set forth in the Associated Equipment Dealers Construction Rental Rate Catalogue, a book known to the trade as "The Green Book." Latta said these rates were the commonly used and

the generally accepted rental rates for construction equipment in the construction industry. The "old Green Book" rates were to apply for old equipment and the "new Green Book" rates were to apply for new equipment and all rates charged for the duration of the contract were on the basis of [572] the Green Book rates. The agreement was had with Adams and Robinson. The rental rates charged by plaintiffs for rental equipment furnished the joint venture from the beginning to the end of the job were the agreed rates shown by the "Green Book."

In the latter part of 1948, Robinson said he knew that plaintiffs' equipment was on the job and charges for rentals were being made and paid. He admitted he had discussed equipment rentals with Adams and Latta after the contract was signed. He admitted that the conversation testified to by Latta could have taken place, he would not deny it, but he said he had never used or looked into the "Green Book." He saw the reports of rentals being paid to plaintiffs and he talked to Adams from time to time. Adams referred to the agreed rental rates as "the old OPA rates established during the war." There was no evidence that the said equipment rental rates charged by plaintiffs were not at one time agreed upon between Latta, Robinson and Adams; or that the rates testified to were not in fact used as the basis for all charges by plaintiffs for rental equipment from the beginning to the end of the job. The evidence shows that rental charges, prior to December 1948, on the basis of the rates mentioned, were approved and paid to plaintiffs by checks on the joint venture account signed by Adams and Latta, until the payments totaled $85,635.96. Robinson knew of these payments. The payments ceased under the following circumstances. Toward the end of 1948 it become obvious that the job was going to lose money. Everything went wrong. Very bad soil, a "bad ground condition", was encountered and there was lots of rain, resulting in delay. Costs were very high. It was apparent that expenses for labor, materials and equipment rentals were far exceeding all estimates.

Robinson testified that after a few visits to the job he saw the only thing defendants were going "to get out of it was to pay for his (Latta's) equipment"; that "the rental on this thing was much more than the equipment was worth"; that from the financial reports made by McAuliff he "could see the job was going to much more than pay for the equipment"; that in October 1948, he instructed Adams that unless Latta "negotiated this thing" to stop all rental payments on plaintiffs' equipment; and that, in February 1949, when he put up $25,000, he told Latta "that was all," unless Latta "wanted to sit down and discuss this rental thing." Robinson said: "The way the job was going the rental would much more than pay for the equipment, and I told him (Latta) and my man Adams that that was all the money we were putting into the job."

Latta would not discuss a change in the equipment rentals being paid by the joint venture to plaintiffs, and Robinson testified, ''I had instructed Adams to stop payment on equipment * * * I said, 'Well, we won't pay him any money and he will discuss it.' '' Robinson further testified ''I complained not about charging too much, but I could see the job was going to run way longer.'' With reference to the time the notes were signed, he said ''I wasn't complaining about the monthly rental, but * * * about the items he bought and rented to the job, and the job more than paid for the equipment.'' He said that he was complaining upon the total Latta was asking and that when ''he (Latta) wouldn't discuss it I wasn't interested in the thing any longer.''

Robinson also testified that it was the customary practice with equipment rental companies that ''in no case do you ever rent anything and more than pay for it''; that if the then currently negotiated rates were in effect ''if the rental amounted to the value of the piece of equipment itself * * * the renter of that equipment would own the equipment; and that ''nearly all the other people gave credit on rentals through bad months.'' Robinson admitted he did not know whether the joint venture had any ''rental purchase agreement'' with Latta.

Over the objection of plaintiffs that it did not tend to show fraud, the defendants were permitted to prove that the total equipment rental charges made by plaintiffs for numerous pieces of equipment used [573] on the job amounted to near the value of or more than the value of the particular equipment ''at the end of that job''; and that Latta still owned the equipment. In a few cases the total rental charges were compared with the original cost of the equipment to Latta, or its value before rental.

Latta testified that he first learned of Robinson's objection to the rental rates in February 1949; that at that time 75% of the equipment was off the job; that plaintiffs' equipment was rented to the joint venture, because Robinson's equipment was busy on other contracts; and that defendants rented the joint venture only a few minor items. According to Latta, the equipment rental rates charged by plaintiffs to the joint venture averaged probably five to seven per cent less than the rate paid by the joint venture to other companies for comparable equipment and that the rates were reasonable. As stated, plaintiffs' rental equipment remained on the project until released by the joint venture (whenever it was released rentals stopped), invoices for rentals at the prior agreed rates were filed and shown on the records of the joint venture (but remained unpaid.) The project was completed in May 1949.

On May 13, 1949, a payment of $103,475.30 (a semi-final estimate) was due from the United States Government. The contract having been taken in plaintiffs' name, plaintiffs had to approve the voucher.

Latta refused to approve it or to deposit the check to the account of the joint venture, until such time as Robinson would "come in and sit down and talk." Latta said it was his only leverage, as Robinson would not contribute any money to the job. Robinson was having troubles with the bank (Latta knew of the situation) and the bank would go no further. Robinson said the bank was insisting that he reduce his indebtedness. Robinson, thereafter, agreed to meet Latta in the office of Latta's attorney, where a settlement agreement was entered into covering defendants' half of the alleged loss on the joint venture. The agreement was reduced to writing and signed by all parties on May 31, 1949.

With reference to defendants' situation prior to this conference Latta said defendants "were always short of money." Robinson, on the other hand, described his own condition as follows: "But we put all the money in this thing we had, and I just didn't have anything * * * I was only interested in signing whatever you had for me to sign * * * when he (Latta) got hold of the estimate he tied it up, and that's when I signed, whatever it is, and I only read it once."

Prior to this meeting, the twelfth and last complete financial statement covering the status of the joint venture had been prepared by McAuliff under date of May 23, 1949. This showed a net loss of $210,491.51, including a $13,000 penalty. As of May 15, 1949, bills payable were $76,259.22 of which $39,053.83 were in fact due to or charged by plaintiffs. The conference between Latta and Robinson extended over a part of several days before the agreement was signed and the notes executed and delivered.

The parties to the agreement were the parties to this action. The agreement contained a recital concerning the prior contractual relationship of the parties; stated that the Wood River project had been completed and the parties had lost in excess of $200,000, including penalties, in the performance of the contract; that the loss would be reduced by $15,000, the agreed value of salvage from chattels purchased; that the joint adventurers owed in excess of $80,000 to creditors and a substantial amount to the named bank; that first parties (plaintiffs) had advanced a substantial amount more than the second and third parties (defendants), who had only advanced $45,000; that under the contract of February 27, 1948, the parties were to share the losses of the joint venture; that second and third parties were "unable to pay their respective one-half of the expenses * * * and assume their one-half share of the losses"; and that first parties had agreed to pay all unpaid bills on terms. In consideration of mutual covenants and a recited consideration, the second and third parties agreed to execute and deliver to [574] first parties certain described notes (the notes sued on herein). Second and third parties further agreed to and closed the joint venture

checking account by a check to first parties, they released and delivered all salvage from the joint venture to first parties, they released the first parties from all liabilities arising out of the joint venture and, finally, they ratified and approved a brief financial statement showing how the loss was figured and the amount of the notes determined. First parties agreed that certain credits, under certain circumstances, would be given on the last maturing note. The contract was dictated in Robinson's presence and he admitted the execution and delivery of the contract; that it was signed and sealed by the corporation; and that the notes were executed and delivered under and pursuant thereto.

Robinson admitted that before this contract and notes were signed he had complained "about the amount of rentals that Latta was going to collect on the job"; and that he "knew it was an awful lot, much more than the equipment was worth." Robinson said the notes were given in the settlement instead of money, because he didn't have the money at that time. He quoted Latta's attorney as saying: "We will get these notes and agreement signed up, and we will work this thing out." No request for arbitration was ever made by either party to the contract of February 27, 1948. The matter was only discussed.

Robinson's testimony in support of the alleged want of consideration for the notes and the false and fraudulent representations under which defendants were induced to sign the notes was about as follows: He said that, while he knew certain equipment rentals and charges were made by Latta and that checks therefor had been issued to Latta, he "had no idea of the amount involved." At the time he signed the notes he did not know that the alleged operating loss of $197,491.51 included total charges of $128,000 by Latta. He didn't know the *total* that Latta was claiming as rentals. He "had no idea what the figure was," or "what the final figure was." He did not ask and, neither Latta, Latta's attorney or anyone else told him that Latta's *total* charges amounted to $128,000. He knew Latta had gotten "quite a bit", a "substantial amount", but he did not know the *amount*, or that the prior payments to Latta *totaled* $85,000. He was led to believe that the loss was $197,491.51, but he had no audit or figures except those presented by Latta. In the memorandum attached to the contract there was no "breakdown" showing that Latta's total equipment rentals and other charges for the entire project *totaled* $128,000. After this suit was instituted, he had an audit and computation made showing the *total* equipment rentals charged by Latta. Until that time, he had no idea that all of Latta's charges for rentals for equipment on the job *totaled* $105,000. He didn't know how much rental the joint venture was paying to others, but that "late in the job" he insisted that the joint venture use some of his equipment on the job. He knew that equipment was to be

rented "at a negotiated basis." Adams was his agent and representative in full charge, "within reason" or "up to a certain point", and "the job was pretty much up to Mr. Adams." Adams signed checks to the very end of the job. Robinson said he would say that he knew most of the things that Adams knew. He saw and talked to Adams often. He supposed that Adams sent the financial reports to his (Robinson's) office regularly. He saw in these reports that rentals for equipment were being paid to Latta. He did look at a lot of McAuliff's monthly statements of costs on the job. He knew that equipment rentals prior to December 1, 1948 had been paid to Latta. He several times admitted, and several times denied, that before the notes were made, he knew that these rental charges already paid *totaled* $85,000. Before the notes were signed he knew that Latta's claim for equipment rentals were included in the loss *totals* shown by the agreement of May 31, 1949, but he didn't know the total rentals charged by Latta for the whole job, until he got his own audit. His office had, prior thereto, received copies of McAuliff's figures showing the total loss, but he had no idea what "the settlement figures" were going to be until he met with Latta. When the notes were signed, he knew there was [575] money due and bills owed, but he didn't know that Latta was claiming a *total* of $39,000 for rentals after December 1, 1948. He said there was nothing to have prevented him from looking at the records. The records and reports were available, but the total charges by Latta had not been summarized and segregated and shown therein. He said that as far as this suit was concerned the only matter he was complaining of was the equipment rentals; that he had to sign the contract and notes in question because Latta refused to go on and refused to indorse the government voucher, unless he (Robinson) paid up his part of the loss or arranged to pay it; that he (Robinson) had to sign to get his own money released; that Latta had his (Robinson's) money tied up; and that he (Robinson) signed to get his own money released by the bank. Robinson, however, repeatedly refused to say that Latta or Latta's attorney had ever said anything to him at any time that was untrue, but he said that Latta "didn't live up to the contract that we signed."

The essence of respondents' position is that joint adventurers, like co-partners, bear a confidential relationship to each other and, while the enterprise continues, each one owes the other the continuing duty of exercising the utmost good faith and the duty to make a full and candid disclosure of all facts bearing upon all transactions between them connected with the joint venture. Respondents cite Creason v. Deatherage, 325 Mo. 661, 30 S. W. (2d) 1, 6; Denny v. Guyton, 327 Mo. 1030, 40 S. W. (2d) 562, 590; Beil v. Gaertner, 355 Mo. 617, 197 S. W. (2d) 611, 616; Feinberg v. Millner (Mo. App.), 178 S. W. (2d) 108, 112; 68 C. J. S. 516, Sec. 76; 40 Am. Jur. 219,

Sec. 130, and other authorities. Respondents say that the record shows Latta never disclosed to Robinson that, of the operating loss of $197,491.51, the sum of ''$102,855.47 represented rentals paid to or claimed by Latta, and $25,461.93 represented 'sundries' charged by him against the venture''; that Latta ''had no right to induce Robinson to sign the notes without fully and candidly disclosing that the operating loss of $197,491.51 included $128,317.40 paid or charged in favor of Latta''; and that Latta's failure to make a full and candid disclosure of all material facts in good faith constituted fraud which vitiated the notes in suit. Respondents point out that the monthly statements and the recapitulation of profit and loss issued by McAuliff (the bookkeeper for the joint venture) *do not show* ''the fact that out of a total operating loss of $197,491.51, Latta received $102,855.47 as rentals, and $25,469.93 as 'sundries' or a total of $128,317.40.'' Respondents say that ''the figure of $102,855.47 charged by Latta as rentals does not appear at any place in said exhibits'' and, also, that ''the figure of $25,469.93 charged by Latta as sundries does not appear anywhere in said exhibits.'' Respondents further accuse Latta of '' 'highpressuring' Robinson into signing the notes in suit before the latter had an opportunity to check Latta's excessive charges, and without letting Robinson know *how large a part* of the total loss represented money already paid to Latta and charges in his favor.'' (Italic ours.) Respondents say that Latta admits that he deliberately put Robinson under pressure by refusing to deposit the Government voucher in order to force Robinson to make a settlement; and that, while Robinson was under pressure brought about by Latta's wrongful conduct, Latta procured Robinson's signature to the contract and notes of May 31, 1949. Respondents further contend that the dispute between the joint adventurers did not relieve Latta from his duty to refrain from taking any advantage of Robinson by misrepresentation, concealment, threats or adverse pressure of any kind.

As stated, the only defenses attempted to be pleaded in defendants' answer were want of consideration and fraud, to wit, false and fraudulent representations made by plaintiffs to defendants. The false and fraudulent representations alleged to have been made by plaintiffs to defendants were that the sum for which the notes were executed and delivered ''was the amount due and owing after all proper setoffs and deductions.'' Defendants alleged that ''plaintiffs knew that said sum so represented as being due and owing by defendants was not a [576] true accounting between the partners and plaintiffs had failed, neglected and refused to allow all proper credits to defendants''; and that defendants relied on these false and fraudulent representations and were thereby induced to sign the notes to their detriment. The parties purported to try the cause upon the issues raised by the pleadings. Much evidence was admitted over plaintiffs'

objections that it did not tend to show fraud, while defendants at all times insisted that the evidence objected to was admissible to prove the fraud pleaded. Defendants obtained an instruction that the term "false representations" "means any wilful misrepresentation * * * or concealment of a material fact affecting the transaction between the parties to this action", and they further submitted the issue of duress by plaintiffs in the conjunctive with the issue of false representations in obtaining the notes sued on.

The essential elements necessary to constitute actionable fraud are the same, whether it is used by way of defense or as a cause of action. 37 C. J. S. 219, Sec. 4. These essential elements are "that a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury and damage." 23 Am. Jur. 773, Fraud and Deceit, Sec. 20. And see Dolan v. Rabenberg, 360 Mo. 858, 231 S. W. (2d) 150, 154; Powers v. Shore (Mo. Sup.), 248 S. W. (2d) 1; Lowther v. Hays (Mo. Sup.), 225 S. W. (2d) 708, 713. The establishment of each of the essential elements is necessary to establish fraud. Dillon v. Hill (Mo. Sup.), 178 S. W. 85; Orlann v. Laederich, 338 Mo. 783, 92 S. W. (2d) 190, 194. The burden of proof to establish the affirmative defense of fraud, as pleaded, rested upon the defendants. State ex rel. Stevens v. Arnold, 326 Mo. 32, 30 S. W. (2d) 1015, 1018.

Respondents point to no alleged false and fraudulent representations made by the plaintiffs to the defendants except they say that the memorandum showing a total operating loss of $210,491.51 "constituted both a false and fraudulent representation of the amount of the loss, and a concealment and failure to disclose credits and deductions to which defendants, according to their testimony, were entitled." Respondents insist that the withholding of information with reference to plaintiffs' *total charges* for rentals and for "sundries" for the entire construction project was equivalent to a false representation, since a fiduciary relationship existed between the parties and a duty rested upon plaintiffs to make a full and candid disclosure of all material facts; and that defendants' allegation that plaintiffs falsely and fraudulently stated that a certain sum was the correct amount of the loss, when plaintiffs knew it was not correct by reason of failure to allow proper credits and deductions, was "tantamount to an allegation that they (plaintiffs) failed to disclose, or concealed, the amount of credits and deductions to which the defendants were entitled." Respondents say "the evidence raised a jury issue with respect to fraud on the part of plaintiffs in procuring the defendants to execute the notes sued on."

There was no evidence tending to show that plaintiffs prepared the monthly financial statements issued during the progress of the work, or the final statement covering the financial status of the joint venture. These statements were prepared by McAuliff, the employee of the joint venture, and they were furnished equally to Latta and to Adams and to Robinson's office. There was no evidence that all invoices for rentals and expenditures by plaintiffs were not in fact included and shown by the records, and all charges were included in the statements, but the *ultimate totals* for said specific items were not collected, segregated and summarized in the manner subsequently summarized in defendants' audit. Otherwise stated, out of a total cost and expense of $983,401.33 for constructing the dam, the total equipment rentals charged by plaintiffs amounted to $102,855.47 and the total cash expenditures made for ''sundries'', which plaintiffs advanced and paid and then charged back against the joint [577] venture, amounted to $25,469.93. Only $83,487.53 in equipment rentals were paid to all others. The $128,317.40 paid to, or claimed by plaintiffs was of course no more a part of ''the total operating loss'' than was every other part of the $983,401.33 representing the total cost and expense of constructing the dam.

No evidence was offered to show that Latta, prior to the execution and delivery of the notes, had any personal knowledge as to what the *totals* or *final figures* were for all the rentals and ''sundries'' collected or charged by plaintiffs against the joint venture. Latta said that both parties had the same information from the bookkeeper. These *totals*, to which Robinson referred, were only obtained, and apparently could only have been ascertained, after a complete audit. Robinson admittedly obtained these *figures* or *totals* from his own audit prior to the trial. In this connection, it should be said, that defendants' own witness Latta testified that the ''sundries'' charged against the job were ''actual cash expenditures'' for truck rentals, floats, moving equipment to the job and back, and for labor. There was no evidence to the contrary and there was no testimony that any item charged as ''sundries'' was improper. No item was even questioned by defendants' evidence.

While Robinson testified that he did not know the specific amounts and total charges made by plaintiffs for equipment and ''sundries'', he did know these charges had been made and were included in the totals shown. .He knew the work was being done under the personal supervision of his agent and representative Adams; and that the records were being kept by McAuliff, an employee of the joint venture; and that such records were equally available for inspection to both parties. He so testified. Further, the admitted fact that Robinson thought Latta should make some allowance on equipment rentals, and that Robinson insisted on some adjustment because of the adverse conditions encountered, and because the job was being prolonged and

the rentals would probably pay for some of Latta's equipment, conclusively shows that Robinson was fully advised of the situation and did not question the fact that the rental rates to which he objected were included in the figures showing the total operating loss. It is admitted that Latta did refuse to reduce the rental rates, which he testified were reasonable and proper and were less than the joint venture was paying to other companies for similar equipment, and were materially less than the rentals that he (Latta) was paying for similar equipment rented for use on other projects. Prior to February 1949, when Robinson ordered Adams to sign no more checks to Latta, the record shows that Adams, with Robinson's knowledge, had approved and paid to plaintiffs invoices for equipment rentals, or for rentals and "sundries", which in fact totaled $85,635.96. The total charges by plaintiffs for rentals and "sundries" after December 1948 only totaled $39,053.83.

The mere fact that Latta failed to have an audit made and have all of plaintiffs' invoices and charges for rentals and "sundries" segregated and totaled so as to be able to advise defendants of the ultimate totals was wholly immaterial to any of the issues in this case. The totals were a mere matter of mathematical computation which could have been made by either party. No duty rested upon plaintiffs to make such a computation and advise the defendants. The dispute as to rates, and the alleged need for allowances, adjustments or credits were equally known to the parties. These matters had been in dispute for months. No concealments and no false and fraudulent representations are shown by this record. On Robinson's own testimony there was no concealment of any material fact, there was no false and fraudulent representations by plaintiffs to defendants and there was no reliance by defendants upon any false statements of fact, or upon any deception by plaintiffs. Defendants signed the contract and executed and delivered the notes sued on with a full knowledge of essential facts necessary to make the contract and notes binding upon them.

The execution, delivery and non-payment of the notes was admitted and the notes were offered in evidence. The defendants failed to offer any substantial evidence in support of their affirmative defenses. [578] The court, therefore, should have directed a verdict for plaintiffs for the full amount due on the notes. Allison v. Tucker (Mo. App.), 170 S. W. (2d) 963. In such situation errors if any in the instructions are wholly immaterial, since the issues of fraud and want of consideration should not have been submitted to the jury. O'Dell v. Dean, 356 Mo. 861, 204 S. W. (2d) 248, 249. Nor was the court authorized, under the record presented, to grant defendants a new trial on the ground of an excessive verdict. Rose v. Thompson, 346 Mo. 395, 141 S. W. (2d) 824, 830. The court abused its discretion in granting defendants a new trial. The order

granting a new trial is reversed and the cause remanded with directions to enter judgment for plaintiffs and against defendants for the amount of principal, interest and attorneys' fees due on the notes. All concur.