**Nancy Lakenan SIMPSON, Plaintiff-Appellant,**

v.

**James A. SPELLMAN, Jr., et al., Defendants-Respondents.**

**No. KCD 26481.**

Missouri Court of Appeals, Kansas City District.

March 31, 1975.

Motion for Rehearing and/or Transfer Denied May 6, 1975.

Application to Transfer Denied June 9, 1975.

Max W. Foust, Duke W. Ponick, Jr., Kansas City, for plaintiff-appellant.

Roger W. Penner, Courtney W. Perkins, Kansas City, for defendants-respondents.

Before DIXON, C. J., and SHANGLER and WASSERSTROM, JJ.

DIXON, Chief Judge.

A stockholders derivative action in equity. Plaintiff is a minority shareholder in a closely held Missouri corporation, American Investors Alliance, Inc. The defendants are James Spellman, majority shareholder, controlling director and his alter ego corporation, Ridge Spellman Insurance Agency. The suit to require the defendants to, first, account for an allegedly inadequate consideration for the purchase of treasury stock or to rescind the transaction and, second, to recover rent from the cor-

porate defendant for space occupied by Ridge Spellman Insurance Agency in an office building in Kansas City known as 916 Walnut Street Building which is the principal asset of American Investors Alliance. One of the plaintiffs died before trial; her death was suggested, but there was no revival of the action, and it proceeded to trial with Simpson as sole plaintiff.

The trial court found against the plaintiff on that portion of the litigation directed to the purchase of treasury stock but found for the plaintiff on the issue relating to rental due in the amount of $4,662. Attorneys fees were allowed to American Investors Alliance of $1,000. Only plaintiff Simpson has appealed. She contends that the trial court's finding that the price paid of $100 per share for 279 shares of treasury stock is clearly erroneous and that the allowance of $1,000 for attorneys fees should be made to plaintiff and not to the corporation.

■ The trial court made detailed findings and conclusions of law specifically related to the issues raised by the parties. Rule 73.01(3), V.A.M.R., in the form effective on January 1, 1975, applies to this appeal. It reads, in part, as follows:

"3. On appellate review:

(a) The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature.

(b) Due regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses."

The rule as revised eliminates the provisions that "[t]he judgment shall not be set aside unless clearly erroneous." R. L. S. v. J. E. S., Mo.App., 522 S.W.2d 5 (handed down on March 31, 1975, concurrently herewith), holds that appellate review of a court-tried case shall be as in suits of an equitable nature which demands under the existing case law that "due deference be given to the findings and conclusions of the trial chancellor, and that this rule of deference not be ignored 'unless the evidence is palpably insufficient to sustain the findings.'" All inferences will be drawn in favor of the party that prevailed in the trial court. Doyle v. Doyle, 497 S.W.2d 846 (Mo.App.1973); City of St. Louis v. Maloy, 485 S.W.2d 678 (Mo.App.1972). It will be affirmed on this review if it can be sustained on any reasonable theory. In Re M--- K---, 493 S.W.2d 686 (Mo.App. 1973); Edmonds v. Stratton, 457 S.W.2d 228 (Mo.App.1970).

American Investors Alliance, Inc., is a close corporation chartered in Missouri. Its principal asset is the 916 Walnut Building in Kansas City, Missouri. The corporation derives most of its revenue by renting office space in that building.

Prior to July, 1958, the stock in American Investors had consisted of 800 shares, 279 owned by Tom Gavin, 278⅔ shares by James Spellman (in the name of Ridge Spellman), 133⅓ shares by Bobby Lakenan (jointly with his sister Mary Lando), and 45 shares by Mae Ridge Wood, and 64 shares by Nancy Simpson, the daughter of Bobby Lakenan. It is not entirely clear from the record, but it seems that James Spellman, Tom Gavin and Lakenan had all been associated in the American Investors Alliance corporation. Lakenan, plaintiff Simpson, his daughter, and Mae Ridge Wood represented the remaining Ridge interests in American Investors.

It is also a fair inference from the record that there was concern as to the continued operation of the 916 Walnut Building beginning as early as 1958. Spellman, indicating he did not want to be a "minor" stockholder, was at that time negotiating to sell his shares to Tom Gavin. Spellman rejected an offer from Gavin of $120,000, $100,000 in cash and land valued at $20,000 Gavin owned. Spellman was not permitted to give his conversations with Lakenan in early 1958, but it is a clear inference that Spellman refused the Gavin offer because

of Lakenan's concern as to management of the building. Before Lakenan's death, a proposal for Gavin to sell his shares to the corporation had been presented by Spellman to the shareholders, and there was no objection. That plan was consummated within a few days of Bobby Lakenan's death by the sale of the Gavin stock to the corporation for $121,000 or $433 per share; $55,000 was paid in cash and $66,000 by a note secured by second mortgage. In early 1958, prior to the sale, the defendant Ridge Spellman Insurance Agency's 278⅔ shares were 34.83 percent of the stock of Investors. Thomas Gavin's 279 shares were 34.88 percent of the stock. The plaintiff's 64 shares were 8 percent of the stock of Investors. James Spellman, Jr., and his wife, Mary Spellman, owned all of the Ridge Spellman Insurance Agency. After the sale by Gavin in July, 1958, the capital stock of the corporation was reduced by the purchase, and the interest in the corporation held by the Ridge Spellman Insurance Agency increased from 34.88 percent to 53 percent, and the plaintiffs' interest increased from 8 percent to 12 percent.

Since July, 1958, the defendant James Spellman, Jr., has been the president, treasurer, and a director of Investors, and his wife has been the vice-president, secretary, and a director, also. The remaining director has been a nominee of James Spellman.

From 1959 until 1966, the plaintiff and the other two minority shareholders relied upon and trusted James Spellman, Jr., to manage and operate the corporation. In 1959, he solicited a proxy from them authorizing him to sell the 916 Walnut Building for $550,000. Between 1959 and 1962, he rejected two offers to purchase the property for $450,000. In 1959, he wrote the plaintiff that the corporation was having problems renting its office space. Between 1959 and 1964, the corporation spent $149,500 on improvements to the building. At the trial in 1970, Spellman testified that the building was 95 percent occupied.

In March, 1965, James Spellman, Jr., Mary Spellman, and their lawyer constituted the Board of Directors of Investors. On March 4, 1965, the Board of Directors voted to offer for sale to the current stockholders 279 shares of stock at the par value of $100 per share. Under the offer, each stockholder had the right to purchase that percent of the shares offered which was proportionate to the percent interest in the corporation which the stockholder held. The offer was for a 30-day period. If, after that period, any stock was unsubscribed, a subscribing stockholder could purchase any amount of the unsubscribed stock.

On May 6, 1965, James Spellman, Jr., wrote to plaintiff stating she had the right to purchase a proportionate number of the shares being offered. He told her that the Ridge Spellman Insurance Agency had the right to purchase 150 shares under the proportionate offering; that the two other minority stockholders were being offered the same opportunity to purchase a proportionate number of the shares.

The plaintiff replied by mail, stating:

As to the additional 279 shares, I'm sure you're aware that I'm in no position to take advantage of the offer . . .

She stated further that she felt it would be a bad investment to purchase more Investors stock. However, she concluded by saying:

I'm enclosing the signed proxy and you do what you feel is best. No one can ask more than that of you.

The two minority shareholders other than the plaintiff did not accept the offer.

The defendant, James Spellman, Jr., purchased all 279 shares offered at the par value of $100 per share, title being placed in the Ridge Spellman Insurance Agency.

Prior to 1965, Investors regularly declared $8–10 per share ordinary dividends. In February, 1966, the directors of Inves-

tors, still consisting of James Spellman, his wife, and his lawyer, declared an ordinary $10 per share dividend, and an extraordinary $15 per share dividend. In 1967 and 1968, Investors declared ordinary dividends of $10 per share. Investors declared no dividends in 1969.

In 1966, the plaintiff revoked the proxy which she had regularly given to Spellman. In the same year, she requested that she be made a director of the corporation so that she could oversee the minority shareholders' interest. She requested that she be placed on the payroll and without performing any services be paid $285 per month. James Spellman, Jr., told her that the corporation did not pay directors fees. He said he would not help her be made a director because she had no business experience, which she conceded, and because she lived in Southern California and was not familiar with Kansas City, Missouri. He told her the lawyers had advised him that payments to her without her rendering service would not be accepted by the taxing authorities as business expense of the American Investors Alliance.

The plaintiff filed this suit in September, 1968. It was tried in November, 1970. The trial court rendered its findings, conclusions, and judgment in October, 1972.

Originally, it was the rule of law in Missouri that any transaction in which a director of a corporation purchased corporate property was constructively fraudulent. The early courts felt that a director could not represent the best interests of the corporation in the sale of corporate property at the same time that he was also personally interested in that sale. An exception to that rule was that the sale was not constructively fraudulent if the corporation was adequately represented in the sale by other disinterested directors.

In Johnson v. Duensing, 340 S.W.2d 758 (Mo.App.1960), cited by the plaintiff, the directors of a corporation voted to sell 545 shares of treasury stock at the par value of $20 per share. The book value was $65.18

per share. The market value was $50 per share. One of the directors purchased 200 shares at par value. He then sold them at a $5 per share profit. The court relied on the early rule in Missouri, stating, 1.c. 769:

"The result is, therefore, that regardless of the sufficiency or insufficiency of the price paid by the defendant Proctor for the 200 shares of treasury stock sold to him, which price he, as a director, helped to fix, and which stock he later concededly resold at a profit, such sale to him was violative of the public policy of this state and, when attacked, is voidable on the ground of constructive fraud."

In Frankford Exchange Bank v. McCune, 72 S.W.2d 155 (Mo.App.1934), the original rule was clearly explained. The court said, 1.c. 158:

"[T]he law, in placing its stamp of disapproval upon the maintenance of inconsistent positions by corporate officers, does not pause to inquire whether the contract or transaction was fair or unfair, nor does it undertake or attempt to consider the question of abstract justice in the particular case. Rather, it stops its inquiry when the inconsistency of position is disclosed; it sets aside the transaction, or refuses to countenance it, when it is the product of a dual undertaking; and thus, in so far as may be, it prevents the accomplishment of frauds by making them impossible at the outset."

See also Hill v. Rich Hill Min. Co., 119 Mo. 9, 24 S.W. 223 (1893); Central Mfg. Co. v. Montgomery, 144 Mo.App. 494, 129 S.W. 460 (1910).

■ The strict prohibition against directors conducting any personal transactions with the corporation of which they are a director was modified in Ramacciotti v. Joe Simpkins, Inc., 427 S.W.2d 425 (Mo. 1968). Under the rule set out in *Ramacciotti,* supra, a director may conduct personal transactions with his corporation if he can prove that he has not gained uncon-

scionable or secret profits in the transaction and that he has dealt openly, honestly, and fairly with the corporation and the stockholders.

"The relation alone of a director or officer of a corporation does not *prevent* the director or officer from doing business with the corporation at a profit." (1.c. 432).

In light of the rule in Ramacciotti, the burden was upon the defendant to prove that he or his alter ego corporation received no unconscionable or secret profit in the transaction and that the transaction was conducted fairly, honestly, and openly.

The crucial issue is whether the defendant profited unconscionably from this transaction. The plaintiff, in her brief, admits, "the central issue in this case is whether the defendants paid an adequate consideration for the stock in question."

Section 351.185(1) RSMo 1969, V.A.M.S., states, "Shares of a corporation issued and thereafter acquired by it may be disposed of by the corporation for such consideration as may be fixed from time to time by the directors."

Section 351.185(3) makes the judgment of the Board of Directors of a corporation conclusive as to the value of consideration received for any reacquired shares in the absence of actual fraud.

The plaintiff has not attempted to nor could she prove actual fraud in the sale of the stock. The plaintiff's complaint is based on a breach of fiduciary duty of the defendant; not the commission of actual fraud. All agreements were openly made and adequately performed. The plaintiff does not allege that the defendant misrepresented any existing fact to her or to the corporation. The plaintiff does not claim nor prove that the defendant intended to deceive her or the corporation.

In Latta v. Robinson Erection Co., 363 Mo. 47, 248 S.W.2d 569, 576 (banc 1952), the court found the following elements necessary to establish fraud, citing from 23 Am.Jur. 773, Fraud and Deceit, Sec. 20, " 'that a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury and damage.' "

In fact, the record shows that a full and complete disclosure of the affairs of the corporation was made to the plaintiff and no facts were concealed from the plaintiff.

The trial court made a specific finding of fact that the reasonable value of the stock was less than the $100 per share for which it was sold. The plaintiff argues there is no evidence to support such a finding by the trial court.

Plaintiff supports the point by claiming that the $433 per share price paid to Gavin in 1958 and the alleged book value of at least $204 per share at the time of the sale of the treasury stock to Spellman in 1965, as well as the matters relating to the value of the 916 Walnut Building, such as the two offers for $450,000 and $550,000, the substantial improvements of almost $150,-000, the amount of fire insurance, and Spellman's own valuation of the building contradict the finding of the trial court that the value of the treasury stock was less than $100 per share which plaintiff insists was a figure based on Spellman's knowledge plaintiff could not purchase the stock.

Dealing first with the issue of the sale price to Gavin. The purchase of his shares of course represented a purchase of a proportionate part of the assets of the corporation. The quantity and quality of those assets would be reflected in the sales price. There is no dispute but what that sale was at arms length and the result of negotiations between Gavin and Spellman almost on a buy or sell basis.

The evidence is undisputed that Gavin offered to buy Spellman's shares for $430 per share ($120,000 for 279 shares in 1958). If at that time the building had been sold for $350,000 and the debt paid, the shares on distribution of net assets would have been worth $433 per share. It is to be noted that at year end 1957 the corporation was highly liquid, the net quick assets, stocks and cash being over eight times the currently due indebtedness and the total current assets and stocks almost equaling total liabilities. It is also to be noted that although the 916 Walnut Building had not been heavily improved, it did not bear anything like the debt load existing at the later date when Spellman bought the treasury stock.

■ What has been said should be enough to demonstrate that the sale of Gavin's stock to the corporation is not comparable to the sale of the same stock to Spellman. There is more, however, even more persuasive of that lack of comparability. For five years beginning in 1963 and ending in 1967, the corporation showed losses—these exceeded $18,000 in the aggregate. The difficulty in maintaining rentals in the over 50-year-old building is amply shown in the record, as well as the twin factors of a decline in demand for downtown space and the increase in supply of new office space by reason of the building of several multi-story new modern office buildings. The trial court and this court can take judicial notice of facts, trends and events affecting value, even absent such direct evidence as exists in this record.

> " 'There is no reason why courts should pretend to be more ignorant than the rest of mankind,' and that 'courts ought not to proceed on the theory they do not know what every one else does know.' State v. Missouri Pacific Ry. Co., 212 Mo. 658, 111 S.W. 500, 504." Peterson v. Kansas City Life Ins. Co., 339 Mo. 700, 98 S.W.2d 770, 775 (Mo.1936).

As to plaintiff's argument that at the time of the sale of the treasury stock, it bore a book value of over $200, the defendant made a statement in response to a question by plaintiff's counsel that seems to admit such a book value, but the documentary evidence offered by plaintiff disproves that admission. The 1964 year end balance sheet shows total stockholders equity of $104,950 which, on the basis of 521 shares then issued and outstanding, would fix the value of the shares as slightly over $200 per share. On the basis of 800 shares, assuming the same equity, the book value per share was about $131 per share. Even on the basis of adding the consideration paid of $27,500 to the shareholders equity, the book value per share becomes only $134 per share.

It is worth noting that the addition of the $27,500 consideration had the immediate effect of increasing the book value of *all* shares not merely those of Spellman.

The notion of considering Spellman's shares as a separate entity persists in the plaintiff's argument with respect to dividends paid. The trial court found that the plaintiff was estopped to question the dividends, but the issue of estoppel need not be reached, although it is true that plaintiff not only willingly accepted the dividends paid, but repetitively asked for increased dividends. Dividends paid from the period after Spellman's purchase to the date of trial aggregated $36,000. The defendant Spellman received approximately 70 per cent of this, or $25,000, but the portion of those dividends attributable to the treasury stock is only approximately $5,700 for the five-year period on an investment of $27,500.

Spellman did not, as plaintiff argues, receive "$25,000 of the $27,500 paid for the treasury stock." The dividends were paid equally to all stockholders, and the amount attributable to Spellman's acquisition of the treasury stock can only be the dollar increase in sums received by him attributable to the percentage increase by which he shared in the dividends.

As to the remaining factual arguments of plaintiff, they are equally unavailing to

show the trial court's finding erroneous. The offers for the building when considered in the light of the terms of the offers were highly speculative. The improvements were all financed from an increase in corporate debt, both long and short term. Spellman himself was required to personally guarantee the short term debt which says a good deal about what the bank felt was the value of stockholders equity. The insurance on the building was at 80 per cent of "replacement" value and bore no relationship to the value of the 50-year-old structure. Spellman's own estimate of value of the 916 Walnut Building was $390,000 at the time of his purchase of the treasury stock. This demonstrates the same optimism which permitted him to personally secure the short term debt and invest $150,000 in improvements on a 50-year-old building and turn it around from its admittedly unfavorable competitive and low percentage of rental position to a 95 per cent occupancy and a favorable competitive situation at the time of trial. Plaintiff admits, and the record shows, Spellman did an outstanding job in management of the building.

It cannot be taken as a true estimate of value, for when Spellman gave it, he indicated that he arrived at the value by assuming that since he paid $27,900 for 16.2 of the stock, 100 per cent of the stock would be worth $172,000 and that would be the equity in the company. From that, he calculated a value for the building by assuming such an equity value. The fallacy in his reasoning is that there was no such value to the equity, and he completely ignored short term debt in his calculations while it is apparent the short term debt financed the improvements in the building.

■ It was not erroneous for the trial court to find that the defendant made no unconscionable profit from this transaction, either in the sale itself, or from the declaration of the extraordinary dividend.

■ The second burden the court in *Ramacciotto,* supra, placed on a self-dealing director was to prove the transaction was conducted fairly, honestly and openly. It is undisputed that each stockholder had full knowledge of the terms of the offer and adequate opportunity to accept it. In his letter of May 6, 1965, to the plaintiff, the defendant candidly set forth the terms of the offer and why it was being made. He asked the plaintiff to inform him whether she would accept part or all of the offer prior to the next stockholders meeting. The transaction was conducted openly and honestly on these facts. The copies of the financial statements offered in evidence which the plaintiff received, as well as Spellman's correspondence with her, make it clear that she was fully, fairly and accurately informed.

Plaintiff was not an optimist as Spellman was; she did not want to risk her money or credit, and he was willing to do so. The argument of the plaintiff really boils down to wanting the benefit of the gamble she would not take. She claims inability to buy, but she could have borrowed on the sixty-four shares she owned to buy the thirty-two she was entitled to. With ninety-six shares, her debt would have been $35 per share, and her percentage increase in the participation would have equalled Spellman's. The record clearly shows an open, honest and fair transaction.

■ The plaintiff was successful on Count II of her amended petition. She alleged that the defendants used space in the 916 Walnut Building rent-free commencing on January 1, 1963, for business not connected with Investors. The court ordered that the defendants, James Spellman, Jr., Mary Spellman, and the Ridge Spellman Insurance Agency pay $4,662 to Investors in compensation for the rent-free use of the building. The plaintiff claims it was clearly erroneous for the trial court to have additionally ordered $1,000 attorney fees to be paid from the defendants to Investors on Count II. The plaintiff claims the attorney fees should be ordered paid by Investors to plaintiff. It is clear that the plaintiff has a right to receive at-

torney fees from Investors. 18 C.J.S. Corporations § 579 (1934); 39 Columbia Law Review 781 (1939); Jesser v. Mayfair Hotel, Inc., 360 S.W.2d 652 (Mo. banc 1962). The defendants cite no authority authorizing the nominal defendant Investors to receive attorney fees from the actual defendants Spellman or his alter ego corporation. Indeed, Investors filed no third party petition against the defendants seeking attorney fees. The reason attorney fees are allowed to the plaintiff is to make it not prohibitive for a minority stockholder to bring a derivative action. If a minority stockholder were forced to pay the cost of even a successful suit from which he personally derived nothing but the corporation gained an asset, there would be no motivation on the part of stockholders to bring derivative suits. 39 Columbia Law Review 781 (1939).

It is equally established, however, that any attorneys fees awarded must come from the fund created for or gained by the corporation. Leggett v. Missouri State Life Insurance Company, 342 S.W.2d 833, 939 (Mo. banc 1960); Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1881); Atwater v. Elkhorn Valley Coal Land Co., 184 A.D. 253, 171 N.Y.S. 552 (N.Y.App. 1918); Jesser v. Mayfair Hotel, Inc., 360 S.W.2d 652 (Mo. banc 1962). Therefore, the attorneys fees should be awarded to the plaintiff from the $4,662 judgment rendered against the defendants, Spellman, his wife, and the Ridge Spellman Insurance Agency to Investors.

On Count I, the judgment is affirmed, and on Count II the judgment is modified by reversing the portion of the judgment requiring the defendants to pay an additional $1,000 to Investors and by entering under Count II a judgment in favor of plaintiff and against the American Investors Alliance, Inc. in the amount of $1,000 and as so modified, the judgment is affirmed.

All concur.