**GOTHAM INSURANCE COMPANY,**
Appellant and Cross–Appellee,

v.

**PETROLEUM DEVELOPMENT CORPORATION d/b/a Pedeco, Inc., Appellee and Cross–Appellant,**

and

**Warren Resources, Inc. and Oil Technology Fund 1996—Series D, L.P., Appellees.**

No. 04–01–00375–CV.

Court of Appeals of Texas, San Antonio.

July 23, 2003.

Rehearing Overruled Sept. 5, 2003.

---

Karen K. Milhollin, Kent E. Westmoreland, Westmoreland Hall, P.C., Houston, for Appellant.

Francine W. Breckenridge, Michael G. Maloney, Strasburger & Price, L.L.P., Elizabeth C. Bloch, C.A. Davis, Thomas H. Watkins, Hilgers & Watkins, P.C., Austin, Joe G. Roady, Hirsch & Westheimer, P.C., Mary–Ann A. Bellatti, Sheinfeld, Maley & Kay, P.C., Houston, for Appellees.

Sitting: ALMA L. LÓPEZ, Chief Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

## MEMORANDUM OPINION

Opinion by SARAH B. DUNCAN, Justice.

Gotham Insurance Company appeals the trial court's summary judgment in favor of Petroleum Development Corporation d/b/a Pedeco, Warren Resources, Inc., and Oil Technology Fund 1996–Series D, L.P. in Gotham's suit seeking reimbursement of insurance proceeds it paid under a well control policy after the Halff–Oppenheimer Well # 1 ("the H & O Well") blew out and in Pedeco's counterclaim for breach of contract. In its cross appeal, Pedeco challenges the trial court's summary judgment against it on its counterclaims for bad faith and violations of the Texas Insurance Code. We reverse and render in part, reverse and remand in part, and affirm in part.

### FACTUAL AND PROCEDURAL BACKGROUND

In April 1996, Pedeco, a small New Mexico oil and gas operation, decided to enter the Texas oil patch and sought assistance from a Texas company, R.W. Dirks Petroleum Engineers, Inc. Pedeco and Dirks entered into an agreement under which Dirks agreed to serve as the record operator of Pedeco's Texas wells until Pedeco obtained its Texas registration. As the record operator, Dirks was charged with obtaining well control insurance. Thus, in May 1996, Dirks obtained from Gotham Insurance Company a $2,000,000 well control, redrilling, and seepage and pollution insurance policy. Dirks was the named assured.

Under the well control policy, Gotham agreed "to reimburse the Assured for actual costs and/or expenses incurred by the Assured [in proportion to the Assured's ownership interest] (a) in regaining or attempting to regain control of any and all well(s) insured hereunder which get(s) out of control ... and (b) in extinguishing or attempting to extinguish ... fires ... which may endanger the well(s) insured hereunder." The policy also contained a $250,000 "care, custody, and control" endorsement under which Gotham agreed to "cover the Assured's legal or contractual liability as oil lease operator(s) (or Co–Venturer(s) where applicable) [in proportion to the Assured's ownership interest] for physical loss or damage to, or expenses of salvage of, oil field equipment ... leased or rented by the Assured or in its care, custody and control at the site...."

On December 31, 1996, Pedeco entered into a joint operating agreement ("JOA") with Warren Resources, Inc. ("WRI"), a New York corporation that solicits investors to create limited partnerships to fund oil well drilling and then acts as the limited partnership's managing general partner. Also party to the JOA was one of WRI's limited partnerships, Oil Technology Fund 1996–Series D, L.P. ("the Fund"). According to Norman Swanton, the president and chief operating officer of Warren Development Corp., the Fund "takes the responsibility to drill the wells, and Warren and [Pedeco] agree to supply the tangible equipment and costs on those wells." The JOA also "provides that [Pedeco] will serve as operator of the wells"; and that Pedeco and WRI were to each own a 12.5% interest, while the Fund was to own the remaining 75%. Among the listed leases was the H & O Well.

On January 31, 1997, shortly after the execution of the JOA, Dirks asked Gotham to add Pedeco as an additional assured in the well control insurance policy because, Dirks said, Pedeco owned a nonoperating working interest in twenty-two of Dirks' wells. Based on this information and for no additional premium, Gotham added an endorsement naming Pedeco as an additional assured. This endorsement was renewed when the well control policy was renewed in May 1997. Unlike Dirks and Pedeco, WRI and the Fund chose not to obtain well control insurance.

On July 21, 1997, Pedeco filed with the Texas Railroad Commission a drilling permit that listed Pedeco as the operator of record of the H & O Well. Early in the morning of July 27, 1997, the Halff–Oppenheimer Well #1 ("the H & O Well") blew out and caught fire, destroying Stricker Drilling Co.'s drilling rig, third-party contractors' equipment, and neighboring landowners' crops and fences and contaminating nearby grasses used for cattle grazing. That same day Gotham received notice of the blowout and assigned adjusters from Rush Johnson Associates to investigate. Sometime thereafter, Rush Johnson reported to Gotham that the loss would exceed the policy limits and that Pedeco representatives had advised one of the adjusters that Pedeco owned a 100% working interest in the H & O Well and was operating it at the time of the blowout. This representation regarding Pedeco's 100% ownership of the working interest was repeated in late 1997 in the sworn proofs of loss submitted by Dirks and Pedeco to Gotham. Based on these and other representations, Gotham's attorneys recommended that Gotham pay Pedeco's claim.

To facilitate payment, the parties entered into an escrow agreement by which the policy benefits were deposited to Rush Johnson's escrow account "to be held in escrow for R.W. Dirks Petroleum Engineers, Inc. and Pedeco, Inc. for payment direct to vendors of adjusted and approved

claim amounts." · Ultimately, in accordance with its attorneys' recommendation, Gotham paid into the Rush Johnson escrow account $1,823,156.27 for losses related to the blow-out of the H & O Well.

In late March or early April 1998, the adjuster advised Gotham's attorneys that Stricker Drilling and several third-party contractors had filed lawsuits alleging that Pedeco had not acted as a reasonably prudent operator and had used substandard blow out prevention equipment ("the Frio County lawsuits"). These allegations were investigated by G.S. Bryan, who had been retained by Pedeco's general liability insurer. According to Bryan, the blowout of the H & O Well "was caused by the use of inadequate blowout preventer equipment" in violation of Texas Railroad Commission Rule 36.

After hearing of the allegations in the Frio County lawsuits, Gotham commenced an investigation, ultimately stopped payment on Pedeco's unpaid claims, notified Pedeco of its decision, and then, in May 1999, intervened in the Frio County lawsuit with claims against Pedeco, WRI, and the Fund seeking reimbursement of the insurance benefits paid on behalf of Pedeco. Pedeco counterclaimed for breach of contract, bad faith, and violations of the Texas Insurance Code.

Each of the parties moved for summary judgment on each of the various claims and counterclaims. The trial court granted summary judgment in favor of Pedeco, WRI, and the Fund on Gotham's reimbursement claim; in favor of Gotham on Pedeco's bad faith and Texas Insurance Code counterclaims; and in favor of Pedeco on its breach of contract counterclaim, rendering judgment in its favor for $271,741.88, attorney's fees, and ·interest. Gotham appealed and Pedeco cross-appealed.

## STANDARD OF REVIEW

We review a summary judgment *de novo*. *See Sasser v. Dantex Oil & Gas, Inc.,* 906 S.W.2d 599, 602 (Tex.App.-San Antonio 1995, writ denied). A summary judgment under Rule 166a(c) is proper when the summary judgment record establishes there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law on a ground set forth in the motion. *See* TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985).

## BREACH OF CONTRACT—WELL CONTROL POLICY PROCEEDS

■ Gotham argues the trial · court erred in denying its motion for summary judgment on Pedeco's breach of contract claim and instead granting Pedeco's, because the summary judgment record conclusively establishes that Pedeco did not sustain an actual loss from the blow-out of the H & O Well and therefore was not entitled to recover under the indemnity policy. We agree.

· The parties appear to agree that the well control policy is an indemnity policy. Consequently, Pedeco was entitled to policy benefits for losses it actually suffered and paid. *Highlands Ins. Co. v. City of Galveston,* 721 S.W.2d 469, 471 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.). Thus, Pedeco suffered a "legal loss" for purposes of the indemnity policy only if its losses were not "made good" by a stranger to the insurance contract. *See Paramount Fire Ins. Co. v. Aetna Cas. and Sur. Co.,* 163 Tex. 250, 353 S.W.2d 841, 844–45 (Tex. 1962).

Gotham contends that Pedeco did not suffer a legal loss for purposes of the well control policy because the summary judgment evidence conclusively establishes that

all operating expenses, including those related to the blowout, were advanced to Pedeco by WRI without reimbursement. In support of its argument, Gotham relies upon the deposition testimony of Pedeco's President, Jim Johnson:

Q: At the time that the Well was being drilled, was PEDCO or Pedeco funding 100 percent of the operations?

A: Yes.

Q: Was Warren Resources reimbursing you for any of the cost of the operation?

A: Well, Warren Resources had provided the joint venture funds to us to pay the cost of the Well in a joint venture arrangement.

Q: When you say they had provided the joint venture funds, what do you mean? The funds for the farmout agreement?

A: Yes, for the farmout and also for the drilling and completion cost cleanup and all the other.

. . . .

Q: Out of the 5 to $5.3 million that you think you were out-of-pocket for this Well, how much of that has been funded or reimbursed to you by Warren?

A: The majority to all of it was funded to us . . . .

. . . .

Q: I don't mean to talk over you. Before the payout when you're funding the operations, is it true that all of that money came from Warren Resources or its investors?

A: Yes.

Q: None of it came from Pedeco or Pedeco's own account?

A: Yes.

. . . .

Q: I thought you testified a few minutes ago that of the 5 million or so cost that Pedeco came out-of-pocket in order to pay this Well that paid for the cost related to the blowout, that ultimately those funds were all reimbursed by Warren Resources—

Q: —or funded by Warren Resources?

A: They were issued from Warren Resources to our account, and we paid them . . . .

Gotham also relies upon the testimony of WRI's CEO, Norman Swanton:

Q: In that letter on the first page, it states that PEDCO, Inc., currently has approximately 6 million, 6 and a half million invested in this prospect. What I'm trying to figure out is is that money that PEDCO actually spent or is that money that Warren Resources spent or is that money that the oil fund spent.

A: My understanding is that this is the money that PEDCO spent, remediation costs and drilling costs. Yes, and possibly other costs. There may be land costs, title costs, et cetera.

Q: And would that 6 to 6½ million dollars have been advanced to PEDCO by Warren Resources?

A: Yes.

Q: Has Warren Resources been reimbursed by PEDCO in connection with the 6 to 6½ million dollars advanced in connection with the prospect?

A: No.

In response, Pedeco argues that Johnson's testimony only applies to control of well expenses in excess of the $2 million policy limits and Swanton's testimony is merely a general description of the funding of well operating costs. However, the testimony of both Johnson and Swanton is unequivocal and quite specific with regard to the

manner in which the blowout expenses were paid: although Pedeco may have paid blowout costs, the funds were advanced to Pedeco by WRI; and WRI was not reimbursed by Pedeco for any of the funds advanced. Consequently, any loss that Pedeco suffered as a result of the blowout was made good by WRI.

Pedeco also argues (1) as the well operator, Pedeco was liable for the blowout costs, as well as the expenses incurred in controlling the well, and actually paid approximately $300,000 to various vendors working to control the blowout; and (2) Gotham waived its right to insist on strict compliance with normal indemnity policy requirements by agreeing to set up an escrow account from which vendors were to be paid directly for approved well control and blowout expenses. However, these facts do not change the dispositive fact: Pedeco's loss was "no loss," because all of the expenses it paid were reimbursed by WRI. We therefore hold that, because Pedeco did not suffer a "legal loss," it was not entitled to benefits under the well control policy. Accordingly, the trial court erred in denying Gotham's motion for summary judgment and in granting Pedeco's motion on the breach of contract claim for the remaining policy limits.

## BREACH OF CONTRACT—CARE, CUSTODY, AND CONTROL CLAIM

■ Gotham argues the trial court erred in granting Pedeco's motion for summary judgment on its counterclaim for $94,898.15, representing monies paid to subcontractors for damages to their property in Pedeco's care, custody, and control at the time of the blowout ("the CCC claim"), because the summary judgment evidence offered in support of the CCC claim—the affidavit of Pedeco's President,

Jim Johnson—is conclusory and does not meet the requirements for interested witness testimony set forth in Rule 166a(c), Tex.R. Civ. P. 166a.[1] In response, Pedeco argues that the award was not based solely on Johnson's affidavit but also on the payment schedule approved by Gotham's adjuster, Rush Johnson Associates. However, it is undisputed that the CCC award includes amounts approved by Rush Johnson Associates. And this undisputed fact does not resolve the issue Gotham presents: "whether competent, admissible evidence exists to justify any [CCC] award."

In his affidavit, Johnson testified as follows:

As the result of the settlement of the claims of Stricker, Manning, Williams, and Triumph against Pedeco and others, which claims arose as a result of the blowout and fire at the H & O Well, certain monies were paid by Pedeco to such claimants, as follows:

| | | |
|---|---|---|
| Stricker | - | $85,000.00 |
| Manning | - | $25,000.00 |
| Williams | - | $15,000.00 |
| Triumph | - | $16,505.15 |
| | | $141,505.15 |

The above-described monies were paid to settle claims concerning the destruction of equipment of each of the claimants in use at the wellsite at the time of the blowout of the H & O Well.

Pedeco paid Triumph directly. The monies paid to the other claimants, Stricker, Manning, and Williams, were paid by Pedeco through its joint venture partner, Warren Resources, Inc., and were drawn on and charged to the joint venture account. All such sums are accounted for as an expense of the drilling operation, for which Pedeco is responsible under the joint venture agreements in place.

---

1. Gotham moved to strike Johnson's affidavit, but its motion was denied by the trial court.

In view of the foregoing circumstances, the payments made to the claimants for their equipment destroyed as a result of the blowout and fire at the H & O Well are payments for the destruction of equipment in the care, custody and control of Pedeco at the time of the blowout and fire.

Johnson's affidavit is not supported by any documentary evidence; and it rests upon the same premise as Pedeco's argument relating to the well control costs, *i.e.*, expenses paid by Pedeco with unreimbursed funds advanced by WRI and expenses paid by WRI on Pedeco's behalf are the functional equivalent of Pedeco out-of-pocket expenses. We again reject this argument and hold the trial court erred in denying Gotham's motion for summary judgment and granting Pedeco's motion on the CCC counterclaim.

### RESTITUTION—PEDECO

■ Because Pedeco was not entitled to policy benefits, Gotham argues it is entitled to restitution of the policy benefits it paid under an erroneous belief or mistake of fact. We again agree.

■ ▪As a general rule, a party who pays funds due to a mistake of fact is entitled to restitution from the payee if the receiving party has not materially changed its position in reliance on the payment. *Bryan v. Citizens Nat'l Bank,* 628 S.W.2d 761, 763 (Tex.1982); *Community Mut. Ins. Co. v. Owen,* 804 S.W.2d 602, 605 (Tex.Civ.App.-Houston [1st Dist.] 1991, writ denied); *Singer v. St. Paul Mercury Ins. Co.,* 478 S.W.2d 579, 583 (Tex.App.-San Antonio 1972, writ ref'd n.r.e.) ("An insurer who made a payment under an erroneous belief induced by a mistake of fact that the terms of the insurance contract required such payment is entitled to restitution from the payee."). "The rationale of the rule is that money paid to another under the influence of a mistake of fact belongs in equity and good conscience to the person who paid it." *Id.*

From August 1997 to March 1999, Gotham attempted to resolve the apparent discrepancy between its underwriting information and its adjuster's information. But it was not until discovery in this case—in April 1999—that Gotham obtained actual knowledge that WRI had paid all of the blow-outs costs that Pedeco sought to recover under the indemnity policy. By this time, Gotham had already paid a majority of Pedeco's claim. The summary judgment record thus clearly establishes that Gotham paid Pedeco's claim under the mistaken impression that Pedeco had paid and not been reimbursed for the expenses related to the blow out.

However, Pedeco argues, the general rule permitting restitution when money is paid under a mistake of fact does not apply in the insurer-insured context, because "the Texas Supreme Court in *Texas Assn. of Counties Risk Mgmt. Pool v. Matagorda County,* 52 S.W.3d 128 (Tex.2000) abolished the right of restitution for insurance companies against their insureds, absent an *agreement* by the insured that a settlement funded by the insurer could be recovered by the insurer in the event coverage did not exist." We disagree. *Matagorda County* involves an insurer's suit against its insured for reimbursement of settlement funds paid to a third party claimant under a reservation of rights after the third-party's claim was adjudicated to be excluded from coverage under a comprehensive general liability policy. *Id.* at 131. Thus, *Matagorda County* does not address the issue presented here: whether an insurer is entitled to restitution from its insured when, in reliance upon its insured's representations, it pays an alleged loss that was in fact "no loss" because it was "made good" by a third party.

Pedeco also argues there is no evidence that Gotham paid Pedeco's claim "involuntarily." Pedeco draws this conclusion from the fact that, before paying Pedeco's claim, Gotham retained an adjuster and law firm to investigate and determine Pedeco's interest in the H & O Well. We again disagree. Given the state of the record, it simply cannot be argued that Gotham paid Pedeco's claim "with full knowledge of all the facts." *Pennell v. United Ins. Co.*, 150 Tex. 541, 548, 243 S.W.2d 572, 576 (1951); *see also International Ins. Co. v. Jataine*, 495 S.W.2d 309, 321–22 (Tex.Civ.App.-Corpus Christi 1973, writ ref'd n.r.e.) (insurer's investigation and settlement did not waive its right to recover insurance money paid under mistaken belief that insured had insurable interest in the insured building). And Pedeco submitted no summary judgment evidence tending to establish that restitution would be inequitable. *See Lincoln Nat'l Life Ins. Co. v. Rittman*, 790 S.W.2d 791, 793 (Tex.App.-Houston [14th Dist.] 1990, no writ).

Because the evidence conclusively establishes that Gotham paid Pedeco's claims under the mistaken belief that the claims were covered by the indemnity policy, and because there is no evidence tending to establish that restitution would be inequitable, we hold Gotham is entitled to restitution of the benefits paid to Pedeco. Therefore, the trial court erred in denying Gotham's motion for summary judgment on its restitution claim against Pedeco.

## RESTITUTION—WRI AND THE FUND

█ Gotham also argues the trial court erred in denying its motion for summary judgment on its restitution claims against WRI and the Fund, because Gotham's payments extinguished the valid claims of vendors and thereby discharged WRI and the Fund from debts it owed under the JOA; consequently, Gotham argues, WRI was unjustly enriched by Gotham's payments. We agree.

█ Restitution is not a proper remedy "merely because it 'might appear expedient or generally fair that some recompense be afforded for an unfortunate loss' to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 42 (Tex. 1992) (quoting *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex.App.-Austin 1987, writ denied)). Rather, "for a person to be entitled to restitution, he must show not only that there was an unjust enrichment, but also that the person sought to be charged had wrongfully secured a benefit or had passively received one which it would have been unconscionable to retain." *Corpus Christi v. S.S. Smith & Sons Masonry, Inc.*, 736 S.W.2d 247, 250 (Tex.App.-Corpus Christi 1987, writ denied).

Under the JOA, "[u]nless changed by other provisions, all costs and liabilities incurred in operations under [the JOA] shall be borne and paid, and all equipment and materials acquired in operations of the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit 'A.'" Among the leases covered by the JOA is the H & O Well. According to Swanton, Pedeco and Warren Resources were to each own a 12.5% interest, while the Fund was to own the remaining 75%. Therefore, under the JOA, WRI was liable for 12.5% and the Fund was liable for 75% of "all costs and liabilities incurred in operations" under the JOA. However, as noted above, $1,823,156.25 in blow out costs were paid by Gotham via the Rush Johnson escrow fund. To this extent, the debts of WRI and the Fund under the JOA for operational costs was extinguished. Thus, WRI and the Fund passively benefitted from and were unjustly enriched by Gotham's payment of the insurance proceeds under the mistaken belief that there was

coverage. We therefore hold the trial court erred in granting WRI's and the Fund's motion for summary judgment on Gotham's claim for restitution and in denying Gotham's.

### PEDECO'S CROSS–APPEAL

Pedeco argues the trial court erred in granting Gotham's motion for summary judgment and in denying its cross motion on its claims for bad faith and Texas Insurance Code violations, because Gotham failed to establish it (1) had a reasonable basis for believing Pedeco's claim was not covered under the indemnity policy and thus had no reasonable basis for delaying payment of Pedeco's claim for blow-out control expenses; and (2) it attempted in good faith to effectuate a prompt, fair, and equitable settlement of Pedeco's claim as required by article 21.21, section 10(a)(ii) of the Texas Insurance Code. We disagree.

The parties do not dispute Gotham initially paid Pedeco $1,523,156.27 for losses related to the blow-out. And Gotham established, through the affidavits of its attorney and claims adjuster and supporting letters it sent to Pedeco requesting information, that it only delayed further payments while investigating a discrepancy between its underwriting information and the adjuster's information regarding coverage. In doing so, Gotham established a reasonable basis for delaying further payments. *See Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 193 (Tex.1998); *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 55 (Tex.1997). The trial court therefore correctly denied Pedeco's motion for summary judgment on its bad faith claim and granted Gotham's. *See id.* Accordingly, we affirm the trial court's judgment against Pedeco on its bad faith and Texas Insurance Code claims.

### CONCLUSION

We affirm the trial court's summary judgment against Pedeco and in favor of Gotham on Pedeco's counterclaims for bad faith and violations of the Texas Insurance Code. In all other respects, the trial court's judgment is reversed. We render judgment in favor of Gotham that Pedeco take nothing on its breach of contract counterclaims. Gotham asks that we render judgment in its favor on its restitution claims as well. However, it gives no particulars; and the judgment that should have been rendered is not at all obvious. We therefore exercise our discretion to simply remand Gotham's restitution claims to the trial court for further proceedings consistent with this opinion. *See Members Mut. Ins. Co. v. Hermann Hosp.*, 664 S.W.2d 325, 328 (Tex.1984) (holding cross motions for summary judgment authorize reviewing court to(1) affirm the judgment, (2) reverse the judgment and render the judgment that the trial court should have rendered, or (3) reverse the judgment and remand the case to the trial court for further proceedings).