**Opinion filed August 31, 2015**



In The

# Eleventh Court of Appeals

_____

## No. 11-13-00104-CV

_____

## ST. PAUL FIRE & MARINE INSURANCE COMPANY AND ST. PAUL SURPLUS LINES INSURANCE COMPANY,
**Appellants**

## V.

## PETROPLEX ENERGY, INC., Appellee

**On Appeal from the 142nd District Court
Midland County, Texas
Trial Court Cause No. CV46262**

### O P I N I O N

This appeal involves whether Petroplex Energy, Inc. (Petroplex), which claimed it owned 100% of the working interest in a gas well, the Quinn 1-6H Well in Reeves County, Texas (Quinn Well or Well), can recover, under two policies of insurance,[1] the expenses, damages, and costs that occurred as a result of a blowout

---

[1]One policy is a well-control policy, No. MU05509373, while the second is a commercial general liability policy (CGL), No. VK04203298. The former was issued by St. Paul Surplus Lines Insurance Company, while the latter was issued by St. Paul Fire & Marine Insurance Company. The respective limits of liability were $3,000,000 and $2,000,000.

on that Well.  The trial court granted the motions for partial summary judgment filed by Petroplex and denied the cross-motions for summary judgment filed by St. Paul Surplus Lines Insurance Company (St. Paul Surplus) and St. Paul Fire & Marine Insurance Company (St. Paul).  The parties agreed to an interlocutory appeal of the partial summary judgment orders.[2]  We affirm because the trial court correctly ruled on each of the motions and cross-motions for partial summary judgment.

## I. *Background Facts*

The events involved in this appeal surround the blowout of the Quinn Well.  Petroplex sought to recover "insured" or "covered" expenses, damages, and costs incurred from the blowout and related litigation in Reeves County, while St. Paul Surplus and St. Paul asserted they were not obligated to pay under either the well-control policy or the CGL policy.[3]

### A.  *Petroplex's and Endeavor's Arrangements*

The summary judgment evidence indicated that Petroplex and Endeavor Energy Resources, LP[4] (Endeavor) had many oil and gas deals together.  Stephens, on behalf of Endeavor, and the president of Petroplex, S. Javaid Anwar, orally agreed to partner on the Quinn Well.  Anwar explained that Endeavor provided the rig and technical help.  Petroplex reentered the Quinn Well and completed it in 2006.  Petroplex agreed to assign 80% of the working interest in the Quinn Well to Endeavor, while Petroplex would retain 20% of the working interest; Petroplex would be the operator.  Petroplex executed a partial assignment (Partial Assignment)

---

[2]As provided for in a prior version of Section 51.014(d) of the Texas Civil Practice and Remedies Code, the trial court entered an agreed order in which it granted permission to file this appeal.  Former TEX. CIV. PRAC. & REM. CODE § 51.014(d) (2005) (Act of May 27, 2005, 79th Leg., R.S., ch. 1051, 2005 Tex. Gen. Laws 3512).  As a result, we have jurisdiction.

[3]St. Paul Surplus and St. Paul highlighted that the well-control policy was an indemnity policy and that the CGL policy did not cover legal liability or costs incurred and satisfied by others.

[4]Endeavor Petroleum, LLC (Endeavor Petroleum) is the general partner of Endeavor Energy Resources, LP, and Autry C. Stephens is the sole member of Endeavor Petroleum.

on July 11, 2006, and proposed a joint operating agreement (JOA), but because disagreements over blowout insurance and a few other things arose, Petroplex and Endeavor never signed the JOA. As a result, Endeavor reassigned the 80% interest back to Petroplex (Endeavor Assignment) on July 25, 2006, effective July 11, 2006. The Endeavor Assignment identified the property on which the Quinn Well was located, and it was executed, notarized, and delivered, but never recorded.

In return for the Endeavor Assignment, Petroplex orally agreed to assign to Endeavor interests that Petroplex owned in comparable wells in Midland County and Martin County. While drilling continued, and until the relative value of all wells was known, the parties agreed to account for the wells, including the Quinn Well, as if nothing had changed. Petroplex and Endeavor agreed that they both exchanged expenses for wells on behalf of each other, and Petroplex asserted that, although title to the Midland County and Martin County wells had not yet transferred, Endeavor was firmly entitled to those interests. In addition, both Petroplex and Endeavor agreed that they would account to each other for the expenses exchanged the Quinn Well and the Midland County and Martin County wells on behalf of each other and would make adjustments, as needed, on a dollar-for-dollar basis.

*B. Blowout on Quinn Well*

Pressure from a buildup of gas developed in the annulus between the production tubing and the production casing (the backside). When Petroplex discovered the increased pressure, it initially installed a relief valve on the backside that tied into the sales line. When the pressure increased to a certain level, the relief valve activated and allowed Petroplex to capture and sell the gas collected from the backside. Later, as workers removed the test tubing in an effort to find and repair the cause of the problem, the Well "took a kick." A blowout preventer installed on the Well failed; the Well blew out; and Petroplex, the operator of record, lost control of the Well on September 14, 2007.

Among other things, the blowout polluted the area and resulted in damage to equipment owned by third parties. Various third-party claims were subsequently filed, both by and against Petroplex, in connection with the damages that arose from the blowout of the Well.[5] Petroplex was invoiced for various expenses related to the blowout of the Quinn Well. Petroplex paid those expenses and also settled some claims. In addition, Endeavor advanced blowout expenses for the Quinn Well to Petroplex, as did Anwar's mother, Tahira Khatoon.[6]

*C. Insurance Policies*

On June 29, 2007, St. Paul Surplus issued a well-control policy to Petroplex that covered the Quinn Well, well number "16" on a list of forty-nine wells, while St. Paul issued a commercial liability policy to Petroplex that went into effect on May 10, 2007. Petroplex paid the premiums for both polices. For the well-control policy, for which St. Paul Surplus billed up front, Petroplex timely paid its total up-front premium of $39,479, which included a charge of $1,728.92 attributable to the Quinn Well.[7] Within thirty days following the end of the quarter, Petroplex made quarterly reports of well activity, and the underwriter for St. Paul Surplus billed Petroplex additional premiums due for reported activity in that quarter. St. Paul Surplus acknowledged that the rate schedule in the well-control policy included rates for the Quinn Well and that the Quinn Well was a "well insured," as a "producing well," at the inception of the policy. Before the end of the quarterly reporting period

---

[5]In a separate suit, Pop's Lift Tech, Inc. sued Petroplex in Cause No. 08-10-19210-CVR in the 143rd District Court of Reeves County, Texas (the Reeves County Suit). Pop's Lift Tech sought damages from Petroplex for damage to Pop's Lift Tech's equipment that was damaged in the Quinn Well blowout. One issue in that suit was whether Petroplex owned 100% of the working interest in the Quinn Well. Judge Bob Parks ruled that Petroplex owned 100% of the working interest. Petroplex retained independent counsel in the Reeves County Suit and incurred defense costs that it asserted were recoverable under the policies.

[6]Khatoon was named as an insured on the well-control policy, and she was named as an additional protected person on the CGL policy.

[7]The total cost for the insurance plus fees and taxes was $52,348.01, which Petroplex timely paid.

for the well-control policy, the Quinn Well suffered a blowout during the coverage periods for both policies. St. Paul Surplus contends the Well was not "producing" at that time but was in a "workover."

*D. Procedural History*

The dispute between the parties to this appeal arises under the well-control and the CGL policies of insurance. St. Paul Surplus issued a reservation-of-rights letter and asserted that the well was not insured. Later, St. Paul Surplus and St. Paul claimed Petroplex was not the working interest owner. When St. Paul Surplus and St. Paul failed to pay Petroplex's claims under the two policies, Petroplex filed suit. The parties filed multiple motions and cross-motions for partial summary judgment on several issues. Those contested issues included the following: (1) Who was the working interest owner? (2) Was the Quinn Well insured? (3) Were there "insured" or "covered" losses under the two policies? (4) Did Petroplex incur "insured" or "covered" losses? (5) Could Petroplex recover any "insured" or "covered" losses under the two policies where Petroplex's partner, Endeavor, or others, paid for the expenses, damages, and costs on the Quinn Well?

*E. Rulings of the Trial Court*

The trial court ruled that Petroplex owned 100% of the working interest in the Quinn Well at the inception of the well-control policy and at the time of the blowout. The trial court also ruled that Petroplex had an insurable interest in the Well at the time of the blowout. The trial court ruled that the Well was insured and that no event took place to change the status of the Well or to terminate, modify, alter, or amend the insurance coverage of the Well. The trial court further ruled that Petroplex had no reporting requirements, other than to report the loss of control of the Well.

The trial court also ruled that, contrary to Appellants' assertions, Petroplex suffered covered losses under the well-control policy and that insured losses exceeded the limits of the policy. Regarding the CGL policy, the trial court ruled

5

that, again contrary to Appellants' assertions, Petroplex sustained an insured loss when it incurred and paid defense costs and third-party expenses for the blowout of the Quinn Well.

## II. *Issues Presented*

St. Paul Surplus and St. Paul argued three issues on appeal. They argued in their first issue that Petroplex, which they claimed was not the working interest owner, cannot recover under the well-control policy because Petroplex did not sustain an actual, out-of-pocket loss that is indemnifiable under the well-control policy. They asserted all costs that arose from the blowout of the Quinn Well were sustained and paid by Petroplex's partners or others, without reimbursement from Petroplex.

St. Paul Surplus and St. Paul argued in their second issue that Petroplex cannot recover under the CGL policy because Petroplex did not incur legal liability payable under the CGL policy for third-party settlements, pollution cleanup, or defense costs. They asserted that any liability was satisfied and that all claims and costs were paid by Petroplex's partners or others, without reimbursement from Petroplex.

St. Paul Surplus and St. Paul argued in their third issue that, when the blowout occurred, the Quinn Well was not insured under the well-control policy. They argued that, although Petroplex had paid insurance premiums for "producing" activity on the Well, it had not paid insurance premiums for the increased hazard of a "workover" or "reconditioning" of the Well. They also asserted that, when the blowout occurred, the Well was in a "workover" or "reconditioning" status. As a result, they claimed Petroplex could not recover losses incurred from the blowout because the Well was in a "workover" or "reconditioning" status, but Petroplex had only paid insurance premiums for "producing" activity.

In response, Petroplex argued that it owns 100% of the working interest in the Quinn Well; that the Quinn Well was insured; that it could recover expenses,

6

damages, and costs that were incurred as a result of the blowout; and that it could recover defense costs from the lawsuit in Reeves County as part of its claim under the CGL policy.

### III. *Standard of Review*

We review a trial court's grant of summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When we review a summary judgment, we take as true evidence favorable to the nonmovant. *Id.* A trial court must grant a traditional motion for summary judgment if the moving party establishes that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The nonmovant is not required to file a response to defeat the movant's summary judgment motion; however, once the movant establishes a right to judgment as a matter of law, the nonmovant must come forward with evidence or law that precludes summary judgment. *Clear Creek*, 589 S.W.2d at 678–79.

To determine if a fact question exists, we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755–56 (Tex. 2007). We must consider all the evidence in the light most favorable to the nonmovant, indulging all reasonable inferences in favor of the nonmovant, and determine whether the movant proved that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985); *Clear Creek*, 589 S.W.2d at 678.

When cross-motions are filed and the trial court grants one and denies the other, we review all issues presented and enter the judgment that the trial court should have entered. *Bradley v. State ex rel. White*, 990 S.W.2d 245, 247 (Tex.

1999); *Moon Royalty, LLC v. Boldrick Partners*, 244 S.W.3d 391, 394 (Tex. App.—Eastland 2007, no pet.).

IV. <em>Analysis</em>

Although the record in this case is voluminous, the issues presented to us are quite narrow and involve three questions:

    A.  Did Petroplex own 100% of the working interest in the Quinn Well?

    B.  Was the Quinn Well an insured well at the time of the blowout?

    C.  Can Petroplex recover, as insured losses under either or both policies, the expenses, damages, and defense costs incurred as a result of the blowout of the Quinn Well?

As we explain below, the answer to all three questions is "Yes," and we will address each question in turn.

*A. Question One: Working Interest Owner in the Quinn Well*

Petroplex asserts it is the owner and operator of the Quinn Well. In June 2005, Petroplex acquired its working interest in the Quinn Well from Carroll M. Thomas by his assignment of 100% of the oil and gas lease covering the Quinn Well (Thomas Assignment). By statute, a deed must be in writing and must be subscribed or delivered by the conveyor or the conveyor's agent. TEX. PROP. CODE ANN. § 5.021 (West 2014). For a deed or instrument to effect conveyance of real property, it is not necessary to have all the formal parts of a deed formerly recognized at common law or to contain technical words. If, from the whole instrument, a grantor and grantee can be ascertained, if there are operative words or words of grant showing an intention of the grantor to convey title to a real property interest to the grantee, and if the instrument is signed and acknowledged by the grantor, it is a deed that is legally effective as a conveyance. *Harlan v. Vetter*, 732 S.W.2d 390, 392 (Tex. App.—Eastland 1987, writ ref'd n.r.e.).

Whether an assignment is ambiguous is a question of law. *Moon Royalty*, 244 S.W.3d at 394. A document is ambiguous when the application of the pertinent rules

of interpretation to the face of the instrument leaves the court genuinely uncertain which one of two or more meanings is the proper meaning. *Id.* (citing *Universal C. I. T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951)). A lack of clarity will not create an ambiguity. *Masgas v. Anderson*, 310 S.W.3d 567, 573 (Tex. App.—Eastland 2010, pet. denied); *Moon Royalty*, 244 S.W.3d at 394 (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)).

Three assignments address the issue of who owns the working interest in the Quinn Well: (1) the Thomas Assignment; (2) the Partial Assignment; and the Endeavor Assignment. No other conveyances are in the summary judgment record. Under Texas law, an assignment of interest in real property must be in writing and subscribed or delivered by the conveyor or its agent. *Masgas*, 310 S.W.3d at 570 (citing PROP. § 5.021). The Endeavor Assignment (1) is in writing, (2) contains unambiguous words of grant, (3) was executed by Endeavor and Petroplex, and (4) was delivered to Petroplex.

Stephens asserted, in his affidavit, that the assignment of all of Endeavor's interest in the Quinn leasehold included the Quinn Well even though it did not mention the Quinn Well specifically. And both Stephens and Anwar testified that they intended for the Endeavor Assignment to transfer the entire interest to Petroplex. The Endeavor Assignment is legally effective, and it conveyed title to Petroplex regardless of whether it was recorded. *Thornton v. Rains*, 299 S.W.2d 287, 288 (Tex. 1957); *Chicago Title Ins. Co. v. Alford*, 3 S.W.3d 164, 168 (Tex. App.—Eastland 1999, pet. denied). Petroplex owned 100% of the working interest in the Quinn Well. Expenses advanced by others for the blowout of the Quinn Well did not affect Petroplex's ownership in the Quinn Well. *Masgas*, 310 S.W.3d at 570.

## B. Question Two: Was the Quinn Well Insured at the Time of the Blowout?

Appellants assert in their third issue that the well-control policy, which was issued to Petroplex by St. Paul Surplus, did not cover the Quinn Well because St. Paul Surplus had insured the well only as a *producing* well, not as a well upon which Petroplex was performing *workover* or *reconditioning* activities at the time of the blowout. St. Paul Surplus does not dispute that the Quinn Well was an "insured well" at the inception of the well-control policy. But St. Paul Surplus maintains that the Quinn Well ceased to be an "insured well" when Petroplex began the activities that changed the status of the Quinn Well and ultimately resulted in the loss of control over the Well.

### 1. Construction of Insurance Policies

Insurance policies are interpreted according to the same principles that govern contract interpretation. *See Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 202 (Tex. 2004). The construction of an unambiguous contract is a question of law for the court and is reviewed on appeal de novo, with little or no deference to the trial court's legal conclusions. *See Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009).

When we interpret an insurance policy, this court's primary duty is to give effect to the parties' intent *based on what the policy actually says*. "As with any other contract, the parties' intent is governed by what they said, not by what they *intended* to say but did not." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006) (citing *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998) ("Our primary goal, therefore, is to give effect to the written expression of the parties' intent.")). Ambiguities are resolved in favor of the insured. *Id.* at 745.

We are to construe insurance policies in Texas according to the general rules governing contract construction. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003); *Tex. Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex. 1999). Our primary purpose is to determine the intent of the parties as expressed in the contract under review. *Providence Land Servs., LLC v. Jones*, 353 S.W.3d 538, 541 (Tex. App.—Eastland 2011, no pet.). If a policy of insurance is such that its language can be given a certain or definite legal meaning, it is not ambiguous. *Schaefer*, 124 S.W.3d at 157; *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

Neither St. Paul Surplus nor Petroplex claim that the well-control policy is ambiguous, although each argues for a different interpretation. An ambiguity does not arise merely because the parties offer conflicting interpretations of the policy language. *Schaefer*, 124 S.W.3d at 157; *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). St. Paul Surplus takes the position that the well-control policy "unambiguously defines a 'well insured' as a well for 'which a rate is shown on the schedule of rates' in the Declarations, and [that] no rate is provided for workover activity on the Quinn [W]ell." The policy contains a rate schedule, a portion of which bears the heading: "SCHEDULE OF DRILLING/PRODUCING RATES." Under that heading, the policy provides, "Rates herein are payable on each foot drilled/producing depth, each well." Shown thereafter are various categories of vertical well depth and a corresponding drilling/producing rate. For instance, the drilling/producing rate for a well with a vertical depth of 0 to 5,000 feet is "$.250/.025," indicating that the rate for a well being drilled at that depth is $.250 per foot and that the rate for a well producing at that depth is $.025. At the depth applicable to the Quinn Well ("12,501 - 17,500" feet), the rate shown is "$ - /.098."

The well-control policy also provides "RATES FOR OTHER THAN DRILLING/PRODUCING" and contains provisions for what those "others" are.

The policy also provides a method for rate calculation in connection with those "others." One such designation of "other" is: "Reworking, Reconditioning, Recompletion and Workover Wells." The rate for "Reworking, Reconditioning, Recompletion and Workover Wells" is a function of the "applicable drilling rate." It is St. Paul Surplus's position that the activities in which Petroplex was engaged at the time of the blowout were reworking or workover activities. St. Paul Surplus argues that, because of the "-" shown for the drilling rate for the Quinn Well, the only rate negotiated was for producing activities only "and not any other activity, including workovers."

Petroplex, on the other hand, argues that the Quinn Well was an insured well at the inception of the policy—a fact that St. Paul Surplus does not dispute—and that nothing changed to trigger an interruption in that status. Petroplex asserts the policy covers wells, not activities. Petroplex additionally asserts that coverage for a "well insured" attaches at the inception of the policy and that the policy contains express provisions for changes in the status of a "well insured."

### 2. *Termination of Coverage Provisions*

First, the well-control policy contains terms for termination of coverage under five circumstances. None of those circumstances apply here. Second, the policy contains provisions that address a change in the status of an insured well. Rates are initially figured, and premiums paid up front, based on well status at the inception of the policy. Additional premiums are computed and paid each quarter based upon reports by the insured showing change in activity or status of the well during the policy period. Thus, posits Petroplex, "the parties chose to deal with any changes in activity on a quarterly basis, after the fact, through the reporting clause and true-up of any additional premiums." Petroplex maintains that it was the normal course of conduct for it and St. Paul Surplus to operate in that manner and that it immediately

12

reported the blowout during the appropriate quarter as required under the policy provisions.

Based upon our review of the well-control policy, we agree with the position taken by Petroplex and found by the trial court that the Quinn Well was a "well insured" or "covered" at the inception of the policy and that there were no circumstances that had caused the well to drop out of coverage at the time that Petroplex lost control of the well. Under the unambiguous terms of the policy, a rate was provided for the Quinn Well, and it was, therefore, a "well insured." None of the termination circumstances provided for in the policy apply to the facts of this case. The policy, in unambiguous terms, provided for an after-the-fact, quarterly true-up to account for any changes in the status of an insured well, a provision with which Petroplex timely complied.

### C. Question Three: Can Petroplex Recover under the Policies?

St. Paul Surplus and St. Paul refused to pay for Petroplex's losses because they claimed that (1) Petroplex did not actually sustain the blowout loss, (2) Petroplex did not bear legal liability to defend suits or pay claims, and (3) all costs were incurred or satisfied by Endeavor or others. The summary judgment evidence shows that, prior to the time that the policies were issued, Petroplex acquired 100% of the working interest in the Quinn Well by assignment of a lease that covered the property upon which the Well was located.

### 1. Summary Judgment Evidence

The record contains evidence that the blowout on the Quinn Well occurred after the 80% interest in the well was reassigned to Petroplex. When the blowout occurred, Endeavor advanced funds to Petroplex to pay for blowout expenses. As a result, Petroplex had to provide a dollar-for-dollar credit to Endeavor on the Midland County and Martin County properties. Petroplex expended funds on Endeavor's behalf in both the Midland County and Martin County wells. Endeavor

continued to advance expenses for the Quinn Well on Petroplex's behalf; Petroplex, in turn, continued to fund expenses on the Midland County and Martin County properties on Endeavor's behalf. The two parties accounted for expenses and attendant credits and agreed there would be a final settling up through a "swap" of properties or leases.

## 2. *Gotham IV Decision*

While this case was pending in this court, the Texas Supreme Court handed down its opinion in *Gotham Insurance Co. v. Warren E & P, Inc.*, 455 S.W.3d 558 (Tex. 2014) (*Gotham IV*). All parties to this appeal have filed supplemental discussions of the opinion in *Gotham IV* and its application, which have guided our review of the case. In *Gotham IV*, Pedeco, Inc. (known at the time of the appeal as Warren E & P, Inc.) entered into a joint venture agreement with Warren Resources, Inc. and Oil Technology Fund 1996–Series D, L.P. to drill a series of wells, including a well known as the H & O Well. 455 S.W.3d at 560. The JOA covered the wells after they went into production. *Id.* However, during the drilling of the H & O Well, circulation pressure was lost and formation gas rose to the surface. *Id.* A blowout preventer failed to work properly, and the gas ignited. *Id.* Previously, Gotham had issued a policy of insurance to Pedeco under which Gotham agreed to pay Pedeco, to the extent of its working interest in the well, for actual expenses incurred in regaining or attempting to regain control of the well. *Id.* at 560–61.

When Pedeco notified Gotham of the loss, it claimed that it was the owner of 100% of the working interest in the well. *Id.* Gotham paid Pedeco claims of over $1.8 million. *Id.* at 561. Later, Gotham discovered that Pedeco owned 100% of the equitable interest in the well, but Pedeco had been reimbursed by Warren Resources, Inc. for the well-control expenses. *Id.* When Gotham made that discovery, it sued to recover proceeds that it had paid to Pedeco. *Id.* There are several appeals involved in Gotham's legal battle with Pedeco, but we will confine our consideration

to the *Gotham IV* court's opinion as to whether Pedeco suffered a loss under the policy if it did not incur expenses related to the blowout. *See id.* at 561–62.

The supreme court in *Gotham IV* noted that Warren Resources reimbursed Pedeco for the money that was spent to control the well. *Id.* at 561. However, the evidence there also showed that, in accordance with an agreement between Warren Resources and Pedeco, the two companies were to share evenly in "aggregate" profits and losses at the end of each year. *Id.* The court of appeals had held in an earlier appeal that Pedeco had not suffered a loss because Warren Resources had reimbursed Pedeco for any losses related to the blowout and that Pedeco was not therefore entitled to be reimbursed by Gotham.[8] *Id.* at 561–62.

The supreme court disagreed. *Id.* at 562–63. The *Gotham IV* court noted that, although there was evidence in the record that Warren Resources paid the expenses related to the blowout, there was also summary judgment evidence in the record that Warren Resources and Pedeco had an agreement to share in the aggregate profits and losses at the end of each year. *Id.* at 567–68. The court held that the evidence regarding the end-of-year settling of accounts was sufficient to raise a fact issue as to whether Pedeco suffered a loss and was therefore entitled to the insurance proceeds. *Id.* at 568. That evidence raised a fact issue precluding summary judgment for Gotham, and the summary judgment could not be supported on the ground that Pedeco suffered no loss.[9] *Id.*

---

[8]*Gotham Ins. Co. v. Petroleum Dev. Corp.*, 442 S.W.3d 351, 353 (Tex. App.—San Antonio 2003, pet. denied) (*Gotham I*); *Warren E & P, Inc. v. Gotham Ins. Co.*, 442 S.W.3d 360, 362 (Tex. App.—San Antonio 2006, pet. denied) (*Gotham II*); *Warren E & P, Inc. v. Gotham Ins. Co.*, 368 S.W.3d 633, 634 n.1 (Tex. App.—El Paso 2012) (*Gotham III*), *rev'd*, *Gotham Ins. Co. v. Warren E & P, Inc.*, 455 S.W.3d 558 (Tex. 2014) (*Gotham IV*).

[9]Because there were other issues raised by the parties in connection with the summary judgment, the supreme court remanded the case to the court of appeals for consideration of those other issues.

Gotham presented arguments—like those presented by St. Paul Surplus and St. Paul here—that Pedeco had suffered no loss because it did not actually pay any expenses that occurred as a result of the blowout. *Id.* at 567–68. We find the holding in *Gotham IV* to be instructive in our consideration of the issues in this appeal.

As in *Gotham IV*, there is no controversy over the fact that parties other than Petroplex initially paid for the expenses related to the blowout of the Quinn Well. Further, there is nothing to contradict Petroplex's claim that it would be charged with those expenses when there was a later true-up of accounts between it and Endeavor. Furthermore, the summary judgment record shows that, after the reconveyance of the 80% interest from Endeavor to Petroplex, Petroplex owned 100% of the working interest in the Quinn Well, as the trial court found. Therefore, upon this record, and in the posture in which this case reaches us, under the familiar standards of review that we have set forth above, we hold that the trial court did not err when it granted summary judgment to Petroplex on the issue of whether it had suffered an insured loss under the policies and could recover for such losses.

## V. *Conclusion*

We hold that the trial court did not err when it granted the motions for partial summary judgment filed by Petroplex. We also hold that the trial court did not err when it denied the cross-motions for partial summary judgment filed by St. Paul Surplus and St. Paul. We overrule all of Appellants' issues.

## VI. *This Court's Ruling*

We affirm the partial summary judgment orders of the trial court.

August 31, 2015                                    MIKE WILLSON

Panel consists of: Wright, C.J.,                   JUSTICE
Willson, J., and Bailey, J.

16